ARLINGTON HOTEL COMPANY *v.* FANT ET AL.

No. 157.  Argued January 17, 1929.—Decided February 18, 1929.

Mr. *Thomas K. Martin,* with whom *Messrs. Wm. H. Martin* and *E. Hartley Wootton* were on the brief, for plaintiff in error.

*Messrs. Henry M. Armistead, Ashley Cockrill, A. J. Murphy,* and *Scott Wood* were on the brief for defendants in error.

444

Mr. *William Waller*, with whom *Mr. Seth M. Walker* was on the brief, as *amici curiae,* on behalf of Mrs. Elsie Williams, by special leave of Court.

Mr. CHIEF JUSTICE TAFT delivered the opinion of the Court.

These are three suits brought in the Circuit Court of Garland County, Arkansas, against the Arlington Hotel Company, a corporation of Arkansas, in which the plaintiffs seek to recover for the losses they sustained, when guests of the hotel, in the destruction by fire of their personal property. The hotel was in Hot Springs National Park.

The complaints averred that the United States in 1904 acquired from Arkansas exclusive jurisdiction over Hot Springs Park and that under the common law, which was there in force (*Pettit* v. *Thomas,* 103 Ark. 593), an innkeeper was an insurer of his guests' personal property against fire. In 1913, the Arkansas Legislature enacted a law relieving innkeepers from liability to their guests

for loss by fire, unless it was due to negligence. The complainants contended that this act had no force in Hot Springs Park as it was within the exclusive jurisdiction of the United States, that the demurrers based thereon must be overruled and that judgments should be entered for them. The defendant denied the exclusive jurisdiction of the United States and insisted that the demurrers to the complaint were good and that the defendant was entitled to judgment. There were two hearings. The Circuit Court first sustained the demurrers. This ruling was reversed on appeal by the Arkansas Supreme Court. 170 Ark. 440. Answers were then filed. The three cases were consolidated and went to a jury, and in accord with the final ruling on the demurrers resulted in verdicts and judgments for the plaintiffs, which were affirmed by the Supreme Court. 176 Ark. 612.

By § 3 of the Act of Congress of April 20, 1832, ch. 70, 4 Stat. 505, while Arkansas was still a territory, it was provided:

" That the hot springs in said territory, together with four sections of land, including said springs, as near the centre thereof as may be, shall be reserved for the future disposal of the United States, and shall not be entered, located, or appropriated, for any other purpose whatever."

Arkansas was admitted to statehood in 1836 (ch. 100, 5 Stat. 50), but there was then no reservation of exclusive jurisdiction by the United States over the territory reserved from sale by the Act of 1832.

By Act of Congress of March 3, 1877, ch. 108, 19 Stat. 377, it was made the duty of United States Commissioners, after an examination of the topography of the Reservation, to lay it out into convenient squares, blocks, lots, avenues, streets and alleys, the lines of which were to correspond with the existing boundary lines of the occupants of the reservation.

Section 4 of the act provided:

" That before making any sub-division of said lands, as described in the preceding section, it shall be the duty of said board of commissioners, under the direction and subject to the approval of the Secretary of the Interior, to designate a tract of land included in one boundary, sufficient in extent to include, and which shall include all the hot or warm springs situated on the lands aforesaid, to embrace, as near as may be, what is known as Hot Springs Mountain, and the same is hereby reserved from sale, and shall remain under the charge of a superintendent to be appointed by the Secretary of the Interior: *Provided, however,* That nothing in this section shall prevent the Secretary of the Interior from fixing a special tax on water taken from said springs, sufficient to pay for the protection and necessary improvement of the same."

The Army Appropriation Act of June 30, 1882, ch. 254, 22 Stat. 121, provided:

" That one hundred thousand dollars be, and hereby is, provided for the erection of an Army and Navy Hospital at Hot Springs, Arkansas, which shall be erected by and under the direction of the Secretary of War, in accordance with plans and specifications to be prepared and submitted to the Secretary of War by the Surgeons General of the Army and Navy; which hospital, when in condition to receive patients, shall be subject to such rules, regulations, and restrictions as shall be provided by the President of the United States: *Provided further,* That such hospital shall be erected on the government reservation at or near Hot Springs, Arkansas."

The hospital and accessories were completed about the year 1886. They originally covered twenty acres and have been enlarged from time to time since then. They are within the territory described in § 4 of the Act of

March 3, 1877, *supra,* and within the territory over which Arkansas by Act of February 21, 1903 (Acts of Arkansas, 1903, Act 30), ceded exclusive jurisdiction to the United States. The language of the cession was as follows:

"Section 1. That exclusive jurisdiction over that part of the Hot Springs Reservation known and described as a part of the Hot Springs Mountain, and whose limits are particularly described by the following boundary lines . . . all in township two south, range nineteen west, in the County of Garland, State of Arkansas, being a part of the permanent United States Hot Springs Reservation, is hereby ceded and granted to the United States of America to be exercised so long as the same shall remain the property of the United States; provided, that this grant of jurisdiction shall not prevent the execution of any process of the State, civil or criminal, on any person who may be on such reservation or premises; provided, further, that the right to tax all structures and other property in private ownership on the Hot Springs Reservation accorded to the State by the Act of Congress approved March 3rd, 1901 [1891], is hereby reserved to the State of Arkansas."

By the Act of April 20, 1904, ch. 1400, 33 Stat. 187, Congress accepted this cession and directed that the land should be under the sole and exclusive jurisdiction of the United States, and all laws applicable to places under such sole and exclusive jurisdiction should have full force and effect therein:

"Provided that nothing in this Act shall be so construed as to forbid the service within said boundaries of any civil or criminal process of any court having jurisdiction in the State of Arkansas; that all fugitives from justice taking refuge within said boundaries shall on due application to the executive of said State, whose warrant may lawfully run within said territory for said purpose, be subject to the laws which apply to fugitives from justice found in the State of Arkansas."

The act further provided that it should not be so construed as to interfere with the right of the State to tax all structures and other property in private ownership within the boundaries described.

Section 2 provided that the cession should constitute a part of the Eastern United States Judicial District of Arkansas, and the District and Circuit Courts of the United States for the District should have jurisdiction of all offenses committed within the boundaries.

The Arlington Hotel was constructed upon one acre of this tract thus subsequently ceded to the United States and accepted by it, and the hotel was operated for more than fifty years under lease from the United States until its destruction by fire on April 5, 1923.

The territory included in the cession forms only a small part of the original reservation by the United States from settlement under the land laws. It includes the springs and is about 1,800 feet long and 4,000 feet wide. There is also a larger Hot Springs reservation of over 900 acres owned by the United States, but under the jurisdiction of Arkansas and reserved from sale by the Government for parks. The hospital buildings are about 1,000 feet from the site of the Arlington Hotel. By Act of Congress of March 4, 1921, ch. 161, 41 Stat. 1407, the ceded tract was given the name of the Hot Springs National Park.

The contention of the defendant is that the cession was invalid, and that no jurisdiction was thereby conferred on the United States for the reason that the only power the United States has to receive exclusive jurisdiction of land within a State is to be found in the words of Article I, Section 8, clause 17, of the Federal Constitution, as follows:

" to exercise like authority over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings."

The leading case on the subject is *Fort Leavenworth R. R. Co.* v. *Lowe*, 114 U. S. 525. The question there was whether a railroad running into the military reservation of Fort Leavenworth was subject to taxation by the State of Kansas. The United States had had exclusive jurisdiction over the land in question from 1803 by the cession of France until the admission of Kansas into the Union. For many years before such-admission the land had been reserved from sale by the United States for military purposes and occupied as a military post. Until the admission of Kansas of course the governmental jurisdiction of the United States was complete. But when Kansas came into the Union in 1861 on an equal footing with the original States, the previous military reservation was not excepted from the succeeding jurisdiction of the new State. The Attorney General recommended a State cession of jurisdiction, but it was not given until February, 1875, when the Kansas Legislature enacted:

" That exclusive jurisdiction be, and the same is hereby ceded to the United States over and within all the territory owned by the United States, and included within the limits of the United States military reservation known as the Fort Leavenworth Reservation in said State, as declared from time to time by the President of the United States, saving, however, to the said State the right to serve civil or criminal process within said Reservation, in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said State, but outside of said cession and Reservation; *and saving further to said State the right to tax railroad, bridge, and other corporations, their franchises and property, on said Reservation.*" Laws of Kansas, 1875, p. 95.

The last words seemed to save fully the right of the State to tax the railway. But as the Constitution provided that Congress should have power to exercise exclusive jurisdiction in all places purchased by the consent

of the Legislature of the State in which the same should be for the erection of forts, etc., the Railroad Company contended that no right to tax a railroad on the reservation could be retained by the State and that the saving clause was void.

In answering this claim, the Court pointed out that the United States without the consent of a State might purchase or condemn for its own use State land for a national purpose, and that without any consent or cession by the State, such jurisdiction would attach as was needed to enable the United States to use it for the purpose for which it had been purchased. The Court held that in such a case when the purpose ceased, the jurisdiction of the federal government ceased. But the Court further held that when a formal cession was made by the State to the United States, after the original purchase of the ownership of the land had been made, the State and the Government of the United States could frame the cession and acceptance of governmental jurisdiction, so as to divide the jurisdiction between the two as the two parties might determine, provided only they saved enough jurisdiction for the United States to enable it to carry out the purpose of the acquisition of jurisdiction. The Court therefore held that a saving clause in the language of the cession requiring that the railroad should pay taxes was not invalid but was in accord with the power of both parties and might be enforced. This decided the point in the case.

Mr. Justice Field, in elaborating the opinion, said that if the act of cession of exclusive jurisdiction adopted subsequently to the purchase of the land was followed by a failure of the United States to continue to use the land for any of the purposes for which it was purchased, the exclusive jurisdiction would lapse. This statement that, after the formal cession by the State of exclusive jurisdiction had been accepted by the United States, there was

nevertheless a reverter of the exclusive jurisdiction of the United States though conveyed in the formal cession without limitation, is said by counsel for appellees not to have been necessary for the decision.

In *Benson* v. *United States*, 146 U. S. 325, Benson was indicted in a Federal court for murder committed in the Fort Leavenworth Military Reservation within the exclusive jurisdiction of the United States, and the first question was one of jurisdiction. It was contended that the evidence showed that the murder was committed on a particular part of the Reservation which was used solely for farming purposes, but the Court held that in matters of this kind the courts followed the action of the political department of the Government; that the entire tract had been legally reserved for military purposes (*United States* v. *Stone*, 2 Wall. 525, 527) and that the character and purpose of its occupation having been officially and legally established by that branch of the Government which had control over such matters, it was not open to the courts on question of jurisdiction to inquire what might be the actual uses to which any portion of the reservation was temporarily put. There was therefore jurisdiction and the objection was overruled.

In *Palmer* v. *Barrett*, 162 U. S. 399, the United States acquired title to navy yard lands in the State of New York, the record not disclosing how. In an appropriation act Congress empowered the Secretary of War to sell and convey part of these to any purchaser, provided that they should not be sold at less price than they cost the Government, and provided that prior to the sale of the lands exclusive jurisdiction should be ceded to the United States of all the remaining lands connected with the Navy Yard belonging to the United States. The jurisdiction was ceded by the State to the United States, but the act of cession contained the proviso that the United States could " retain the use and jurisdiction as long as the prem-

ises described shall be used for the purposes for which the jurisdiction was ceded, and no longer. The land in question in the case was not to be used by the United States for a navy yard or naval hospital, but was a part of the vacant land adjoining the Navy Yard which had been leased by the United States to the City of Brooklyn for market purposes. A direct consideration was received by the United States for the lease, since it provided that a supply of water for the purposes of the Navy Yard at reduced rates would be furnished by the city to the United States during the use by the former of lands covered by the lease. This Court said [p. 404]:

" In the absence of any proof to the contrary, it is to be considered that the lease was valid, and that both parties to it received the benefits stipulated in the contract. This being true, the case then presents the very contingency contemplated by the act of cession, that is, the exclusion from the jurisdiction of the United States of such portion of the ceded land not used for the governmental purposes of the United States therein specified. Assuming, without deciding, that if the cession of jurisdiction to the United States had been free from condition or limitation, the land should be treated and considered as within the sole jurisdiction of the United States, it is clear that under the circumstances here existing, in view of the reservation made by the State of New York in the act ceding jurisdiction, the exclusive authority of the United States over the land covered by the lease was at least suspended whilst the lease remained in force."

It is apparent that the Court intended to leave open the question whether, had the cession of jurisdiction been complete and without limitation, the United States would have retained its exclusive jurisdiction.

Counsel for the plaintiffs in the present case insist that the United States has the constitutional authority to maintain exclusive jurisdiction over the tract here in ques-

tion as a national park, and that as the Government undoubtedly may use its control over all land within its exclusive jurisdiction to provide national parks, it may, where land is ceded by a State to the exclusive jurisdiction of the National Government, treat land thus ceded by the State for such a purpose as it would treat national public land which had never come within the jurisdiction of the State; that as by virtue of Article 4 of the Constitution, Section 3, Congress has power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, it may treat land ceded to it by a State for the purposes of making a national park exactly as it would treat land which had always been within its exclusive jurisdiction and subject to its disposition for park purposes. This issue may in the future become a subject of constitutional controversy, because some twenty or more parks have been created by Congress, in a number of which exclusive jurisdiction over the land has been conferred by act of cession of the State.

We do not find it necessary, however, now to examine this question. We think that the history of this Hot Springs National Park, as shown by the legislation leading to its establishment and circumstances which the Court may judicially notice, is such that the small tract whose jurisdiction is here in question may be brought within the principle of the *Lowe* case and other cases already cited.

The Hot Springs are mentioned as remarkable by Thomas Jefferson in a message to Congress on February 19, 1806, in which he transmitted a report containing a description of them. Messages, Reports, etc., 1st Sess. 9th Cong., 1806, pp. 202, 344. Their known value for remedial purposes and the appreciation of that value by Congress were shown in the Act of 1832, already cited, by which the land surrounding them was reserved for the future disposal of the United States. The purpose was evidently to make use of them for national public needs.

The analysis of the forty-four springs indicated that

these waters were of a special excellence with respect to diseases likely to be treated in a military hospital. Therefore it was that in 1882 an appropriation of $100,000 was made for the construction of an adequate hospital under the War Department. That hospital has been enlarged by appropriations from time to time since its original establishment. It was certainly a wise prevision which with the consent of the State brought within exclusive national jurisdiction the hospital buildings and accessories and all the forty-four springs from which the healing waters came in order to secure to the Government their complete police protection, preservation and control. This justified acquisition of the springs and hospital for the exclusive jurisdiction of the United States under clause 17, Section 8, Article I of the Constitution. Nor is the constitutional basis for acquisition any less effective because the springs thus kept safely available for the Federal purpose do in the abundance of their flow also supply water sufficient to furnish aid to the indigent and to those of the public of the United States who are able to pay for hotel accommodation on the little park surrounding the hospital and the springs. *Benson* v. *United States, supra,* and *Williams* v. *Arlington Hotel Co.,* 22 F. (2d) 669.

The cases relied on by the defendant are clearly distinguishable. *Williams* v. *Arlington Hotel Co.,* 15 F. (2d) 412, was overruled by the Circuit Court of Appeals, as above. In *Crook, Horner & Co.* v. *Old Point Comfort Hotel Co.,* 54 Fed. 604, there was an express reverter clause in the act of cession, which limited the use of the land to defensive purposes. *Renner* v. *Bennett,* 21 Ohio St. 431, and *State* v. *Board of Commissioners,* 153 Ind. 302, were cases where Congress had receded jurisdiction to the State. In *La Duke* v. *Melin,* 45 N. D. 349, there had been complete abandonment of a military reservation, which by Act of Congress had been opened to homesteaders.

*Affirmed.*