## UNITED STATES v. UNZUETA.

District Court, D. Nebraska, Chadron Division.
November 5, 1929.

George A. Keyser, Asst. U. S. Atty., of Omaha, Neb.

Allen G. Fisher, of Chadron, Neb., for defendant.

WOODROUGH, District Judge. The defendant is indicted for a murder charged to have been committed on a freight car in a freight train being operated upon and over the railroad tracks of the Chicago & Northwestern Railway Company within and upon the Ft. Robinson Military Reservation within the Chadron division of the district of Nebraska.

By plea to the jurisdiction the defendant, among other things, presents that the place of the alleged murder specified in the indictment was not "a place within the exclusive jurisdiction of the United States." The status of Ft. Robinson as a military reservation within the exclusive jurisdiction of the United States has been settled for this court, and is not now open to question. This court has tried a number of criminal cases, where the acts were committed upon the reservation, and has sustained the jurisdiction, because the reservation is and has long been within the exclusive jurisdiction of the Unit-

ed States. None of these cases are reported, but Judge Shiras reviews the history of the reservation, and establishes the conclusion for the federal court, in the published opinion in Re Ladd (C. C.) 74 F. 31, and the fact that it is a military reservation under the exclusive jurisdiction of the United States is confirmed for state authorities by the Supreme Court of Nebraska in Anderson v. C. & N. W. Ry. Co., 102 Neb. 578, 168 N. W. 196.

But, conceding the exclusive jurisdiction of the United States over the reservation, the question remains whether the trains being operated upon the railroad right of way and the strip of right of way land which bisects the reservation are also places within such exclusive federal jurisdiction. It was settled by the Supreme Court in Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 525, 5 S. Ct. 995, 1004, 29 L. Ed. 264, and C., R. I. & P. Ry. Co. v. McGlinn, 114 U. S. 542, 5 S. Ct. 1005, 1006, 29 L. Ed. 270, as to the Ft. Leavenworth Reservation in Kansas, that the federal jurisdiction over the reservation rests upon a different foundation and has different scope from the federal jurisdiction over the seat of government in Washington and those places within the states which the federal government has purchased for the purposes and in the manner specified in article 1, § 8, of the Constitution.

The lands upon which the Ft. Robinson Military Reservation is situate were public lands, and belonged to the United States, when Nebraska was admitted to the Union, and by the act of admission the lands came under the jurisdiction of the state. When the federal authorities set them aside for its military purposes, the state made cession of its jurisdiction over the lands to the United States. The two legislative enactments are set out and considered by Judge Shiras in his opinion in the Ladd Case, supra. The act of cession and the acceptance thereof by the United States constituted a convention and agreement, and the federal jurisdiction rests upon that, and is limited accordingly. In those cases where the government purchases lands with the consent of the state, in accordance with, and for the purposes specified in, the constitutional provision, the federal jurisdiction is absolute; but, as the military reservation of Ft. Robinson was not so acquired, the language of the Supreme Court in the Lowe Case, supra, is applicable.

The court says: "The military reservation of Ft. Leavenworth was not * * * acquired by purchase with the consent of Kansas. And her cession of jurisdiction is not of exclusive legislative authority over the land, ex-

cept so far as that may be necessary for its use as a military post." The court also says: "It is for the protection and interests of the states, their people and property, as well as for the protection and interests of the people generally of the United States, that forts, arsenals, and other buildings for public uses are constructed within the states. As instrumentalities for the execution of the powers of the general government, they are, as already said, exempt from such control of the states as would defeat or impair their use for those purposes; and if, to their more effective use, a cession of legislative authority and political jurisdiction by the state would be desirable, we do not perceive any objection to its grant by the Legislature of the state. Such cession is really as much for the benefit of the state as it is for the benefit of the United States. It is necessarily temporary, to be exercised only so long as the places continue to be used for the public purposes for which the property was acquired or reserved from sale. When they cease to be thus used, the jurisdiction reverts to the state."

Again in the McGlinn Case, supra, the Supreme Court further said on the same subject: "It is competent for the Legislature of a state to cede exclusive jurisdiction over places needed by the general government in the execution of its powers, the use of the places being, in fact, as much for the people of the state as for the people of the United States generally, and such jurisdiction necessarily ending when the places cease to be used for those purposes." And further in the same case: "The government of the state of Kansas extended over the reservation, and its legislation was operative therein, except so far as the use of the land as an instrumentality of the general government may have excepted it from such legislation."

In the case of Benson v. U. S., 146 U. S. 325, 13 S. Ct. 60, 62, 36 L. Ed. 991, the court held that a murder committed within the limits of the Ft. Leavenworth Military Reservation was cognizable in the federal court, although done upon a part thereof let out temporarily for farming. The court said: "It is contended by appellant's counsel that, * * * jurisdiction passed to the general government only over such portions of the reserve as are actually used for military purposes, and that the particular part of the reserve on which the crime charged was committed was used solely for farming purposes. But in matters of that kind the courts follow the action of the political department of the government. The entire tract had been legally reserved for military purposes. U. S. v. Stone [69 U. S.] 2 Wall. 525, 537 [1 S. Ct. 287, 27 L. Ed. 163]. The character and purposes of its occupation having been officially and legally established by that branch of the government which has control over such matters, it is not open to the courts, on a question of jurisdiction, to inquire what may be the actual uses to which any portion of the reserve is temporarily put. There was therefore jurisdiction in the Circuit Court."

These cases are reviewed by the Supreme Court in the very recent case of Arlington Hotel v. Fant, 278 U. S. 439, 49 S. Ct. 227, 230, 73 L. Ed. 447, and the principles announced in the cases are adhered to and applied to the facts there presented. It appeared that a hotel was being operated on land leased by the United States for the purpose within Hot Springs National Park and the question was whether it was within the exclusive jurisdiction of the United States. The court said: "We think that the history of this Hot Springs National Park, as shown by the legislation leading to its establishment and circumstances which the court may judicially notice, is such that the small tract whose jurisdiction is here in question [i. e., the hotel property] may be brought within the principle of the Lowe Case and other cases already cited."

The court held that all the 44 springs from which the healing waters came were properly brought within the exclusive national jurisdiction, and that police protection, preservation and control over them were properly with the national government, saying further: "Nor is the constitutional basis for acquisition any less effective because springs thus kept safely available for the federal purpose do in the abundance of their flow also supply water sufficient to furnish aid to the indigent and to those of the public of the United States who are able to pay for hotel accommodation on the little park surrounding the hospital and the springs. Benson v. United States, supra, and Williams v. Arlington Hotel Co. (C. C. A.) 22 F.(2d) 669."

The special Act of Congress (23 Stat. 284) granted the Chicago & Northwestern Railroad Company a right of way over and across the lands within the Ft. Robinson Reservation and a perpetual easement for the purpose of operating a railroad, on said lands. The corporation accepted the grant, took possession of the land, and has continuously operated its main line of railroad over it ever since. The action of Congress in turning the land over to the railroad company

for railroad purposes was obviously an abandonment of any federal use of the land for military purposes. The relinquishment of the use and possession of the land by the government was permanent, and there is nothing in the special act to indicate any intention other than that the corporation should permanently use the land granted as railroads universally use their right of way lands for their own profit and public service as carriers.

In the case of Utah & Northern Railway v. Fisher, 116 U. S. 30, 33, 6 S. Ct. 246, 248, 29 L. Ed. 542, the Supreme Court considered the effect of a similar grant of railroad right of way across the Ft. Hill Indian Reservation in the territory of Idaho and said: "By force of the cession thus made [that is, the Acts of Congress granting right of way for the construction and operation of the railroad], the land upon which the railroad and other property of the plaintiff are situated was, so far as necessary for the construction and working of the road, * * * withdrawn from the reservation. The road and property thereupon became subject to the laws of the territory relating to railroads, as if the reservation had never existed."

In that case the parties stipulated that the railroad and its property were "upon the reservation," but the court said that the stipulation had to be read "with reference to the legislation of Congress, and therefore as only establishing that the road and property are within the exterior boundaries of the reservation." So in this case the railroad is in no proper sense upon the Ft. Robinson Reservation. It is merely within the exterior boundaries thereof. In fact, it bisects the reservation. The court decided in the case referred to that the power to tax the railroad property (an attribute of sovereignty) was in the territory.

There is here no question of a temporary use of a part of the reservation, such as might be permitted or sanctioned in the discretion of the commanding officer on the reservation, as considered in the Benson Case, supra. The abandonment of military for civil, and of governmental for railroad corporation purposes was completed by the special act of Congress, and possession taken and maintained by the railroad company. Comparison of the dates shows that the act of Congress relinquishing the railroad right of way was passed before the first act of cession by the state Legislature. The fact is not controlling.

■ When Congress made the grant to the railroad company, and the railroad company accepted it and acted upon it by taking possession, the government's control and jurisdiction over the strip of land ceased. It never thereafter undertook to regulate or control the railroad company in the operation of the road (except through the interstate commerce regulations applicable to all roads). The rulings made as to fences, considered by the Nebraska Supreme Court in the Anderson Case, supra, were regulations of the military reservation, and not of the railroad.

In the case of Clairmont v. U. S., 225 U. S. 551, 32 S. Ct. 787, 56 L. Ed. 1201, a question arose upon a prosecution for introducing liquor into the Indian country. The accused had liquor on a train operated on the right of way of the Northern Pacific Railway passing through the Flathead Indian Reservation in Montana. The Indian Reservation was Indian country and under federal jurisdiction for the purpose of carrying out federal obligations towards the Indians resident there. The inconvenience of splitting federal and state jurisdiction in criminal cases was apparent, and doubtless was the occasion for pursuing the litigation to the Supreme Court. The prosecution admitted the usual test of Indian country was extinguishment of Indian titles, and that the titles were extinguished over the railroad right of way. It relied upon the difficulty of federal protection of its Indians against liquor. The court held that the Indian land titles had been extinguished as to the lands constituting the railroad right of way, and therefore the railroad right of way ceased to be Indian country and became subject to the laws and jurisdiction of the state. The facts are not identical with those here under consideration, but the conclusion demonstrates that the mere difficulty of enforcing state authority over a strip of land extending through an area under federal jurisdiction is not controlling.

■ While the railroad company here is permanently occupying and using its right of way for the operation of its railroad, it cannot be said that the government is exclusively occupying and using the land for any governmental purpose. The decisions of the Supreme Court make the continued occupation and user by the government for a governmental purpose the test of sovereignty. There is an inconvenience in having an area of country under federal sovereignty and a strip of land running through it under state sovereignty. But the federal power must not be extended on account of any supposed convenience. As the federal government was not in occupation or control of the right of way and tracks of the railroad company or the trains operated by the railroad company

upon its own right of way, the place where the crime is charged to have been committed was not within the territorial jurisdiction of this court.

The plea to the jurisdiction of the court ought, therefore, to be sustained. The question, however, is of importance. The order dismissing the case for want of jurisdiction and discharging the prisoner will not be entered until time is accorded the government to review the decision, if it shall be so advised.

### Judgment of the Court.

This cause having heretofore been submitted to the court upon the defendant's plea to the jurisdiction, the court, upon full consideration of the said plea and of the indictment herein returned, finds that this court is without jurisdiction over the alleged offense set forth in the indictment to which said plea is directed.

The court finds that the United States of America has not exclusive jurisdiction over the strip of land comprising the right of way of the Chicago & Northwestern Railway Company through the Ft. Robinson Military Reservation in the state of Nebraska, nor upon said railway company's train of cars situate thereon, whereon the homicide charged in said indictment is alleged to have been committed.

The court finds that the granting of said right of way to the said railway company was an abandonment by the United States of its use of said right of way for military purposes, and thereby the United States ceased to have exclusive jurisdiction over the same— to all of which findings the plaintiff is allowed an exception.

It is therefore ordered by the court that the said plea to the jurisdiction of this court be and the same is hereby sustained, and that the defendant, Francisco Unzueta, be and he is hereby discharged, and this action dismissed, and the United States marshal is directed to release him from custody, and also to release Manuel Cardones and Eriberts Contreras, who are held in custody as witnesses for the government, to which the plaintiff is allowed an exception.

But the United States attorney for the district of Nebraska here gives notice that the United States intends to perfect an appeal from this judgment of the court, and asks that the defendant be not discharged until such appeal may be perfected.

It is therefore ordered by the court that this judgment be not given effect, so far as it relates to the discharge from custody of the said defendant and the witnesses above named, until 30 days from and after the date hereof, but that upon the perfecting of said appeal the said defendant and the said witnesses be and they are hereby granted the privilege of entering into their own recognizance, to appear in court in answer to the said indictment so returned against them, in the event that the appellate court reverses this judgment.