CITY of BARLING, Arkansas *v.* FORT CHAFFEE REDEVELOPMENT AUTHORITY, An Arkansas Public Trust, and Its Trustees; Linda Schmidt; Jerry R. Stewart, M.D.; Joe Edwards, Jr.; Ken Colley; Linda Hobbs; Becky Rhinehart; and Greg Smith, D.V.M.

01-531 60 S.W.3d 443

Supreme Court of Arkansas
Opinion delivered December 6, 2001

*Hardin, Jesson & Terry, PLC*, by: *Bradley D. Jesson, Rex M. Terry* and *J. Rodney Mills*; and *Pryor, Barry, Smith, Karber & Alford, PLC*, by: *Gregory T. Karber*, for appellant.

*Smith, Maurras, Cohen, Redd & Horan, PLC*, by: *Robert Y. Cohen, II* and *Matthew Horan*, for appellees.

Tom Glaze, Justice. In this appeal, arising from a dispute between the City of Barling and the Fort Chaffee Redevelopment Authority, we are asked to resolve the question of who has the authority to designate the use of 7,390 acres that were formerly a part of Fort Chaffee, but which Barling annexed in a series of three elections in 1981, 1982, and 1991. Before proceeding to the legal issues presented by the appeal, a brief recitation of the facts of Fort Chaffee's history is necessary.

In 1941, the United States Department of the Army purchased over 76,000 acres in Sebastian County for the establishment of Camp Chaffee. During its history, Camp Chaffee became Fort Chaffee, and it has served a variety of functions during the past six decades. It was a training base during the Korean War, a relocation center for Vietnamese refugees at the close of the Vietnam War, a relocation center for Cuban refugees in the early 1980s, and a temporary location center for the Joint Readiness Training Center in the 1990s. In September of 1997, Fort Chaffee was closed by the United States government, and, pursuant to Ark. Code Ann. § 22-7-301 (Supp. 1999), the State of Arkansas accepted legislative jurisdiction over the Fort Chaffee property. The cities of Barling, Fort Smith, and Greenwood, as well as Sebastian County, formed the Fort Chaffee Redevelopment Authority (the "FCRA"), an Arkansas Public Trust, to conduct a comprehensive study of all issues related to the closure and redevelopment of the base. Authorized representatives of Barling, Fort Smith, Greenwood, and Sebastian County signed and agreed to be bound by the terms of the Trust Indenture. In 1997, the Arkansas General Assembly "acknowledged" and "endorsed" the Trust as the entity to prepare and implement a comprehensive plan for the optimal use of the property. Act 1201 of 1997, § 14, codified at Ark. Code Ann. § 12-63-103(a) & (b) (Repl. 1999).

In June of 1999, the United States Department of Defense recognized the Trust as the entity to implement the redevelopment plan at Fort Chaffee. In August of 1999, the Trust completed a Comprehensive Reuse Plan for a 7,390 acre portion of the Fort Chaffee. On June 30, 2000, the Trust entered into a Memorandum of Agreement with the Department of the Army whereby it was agreed that a 5,235 acre portion of the 7,390 acres would be conveyed to the Trust with the remainder being conveyed at a subsequent time. The City of Barling had annexed 13,720 acres of

the Fort Chaffee property in three annexations, which occurred in the years 1981, 1982, and 1991, and the 7,390 acres covered in the Comprehensive Reuse Plan are located in these annexed areas. In 2000, Barling passed numerous zoning ordinances that affected the Fort Chaffee property, and which the Trust alleged severely conflicted with the amended Comprehensive Reuse Plan. The conflicts were essentially instances where Barling had zoned park/open space or residential areas that FCRA had designated for public facilities or industrial use.

The Trust filed suit against Barling on September 5, 2000, alleging that the 1981, 1982 and 1991 annexations were void *ab initio* for numerous reasons. It further sought a declaratory judgment that Barling's land use ordinances were *ultra vires* and void to the extent that the ordinances regulated Fort Chaffee property. The Trust also sought to enjoin Barling from exercising legislative jurisdiction over the Fort Chaffee property; enforcing or threatening to enforce Barling city ordinances within the boundaries of that property; collecting taxes, fees, or assessments from the FCRA; and annexing any portion of the Fort Chaffee property without prior approval of the FCRA.

Barling initially filed a motion for summary judgment, submitting in part that FCRA's challenge to Barling's 1981, 1982, and 1991 annexation ordinances and elections was untimely under Ark. Code Ann. § 14-40-304 (Repl. 1998). That statute requires that challenges to annexations must be filed within 30 days of the election. The trial court agreed and granted Barling's motion for summary judgment on November 3, 2000. FCRA cross-appeals from that order.

FCRA then filed its own motion for summary judgment, and asked the trial court to hold as a matter of law that Barling had ceded its legislative authority to the Trust over the Fort Chaffee property, and had no legislative authority over that property. Barling responded by filing its second motion for summary judgment, wherein it urged the court to hold Barling had not ceded its legislative authority to the Trust; it further asked the trial court to hold Barling's ordinances and regulations applied equally to that part of Barling in the annexed areas within the Fort Chaffee property, as they do in all other parts of Barling "proper." FCRA's response asserted that the facts were undisputed and that Barling's imposition of its zoning ordinances would delay implementation of

the Trust's Comprehensive Reuse Plan, discourage potential developers, and endanger the ability of FCRA to complete its Reuse Plan.

The trial court entered an order on January 18, 2001, granting FCRA's motion for summary judgment and declaring that Barling's zoning plans conflicted irreconcilably with the Trust's Reuse Plan. The court further found that had Barling not annexed the Fort Chaffee property in 1981, 1982, and 1991, Barling "would be in the same position as the other municipal beneficiaries of the Trust (Fort Smith and Greenwood) and would be unable to assert any claim that it had legislative authority over the property." The court went on to note, however, that the State of Arkansas authorized a suspension of Barling's legislative authority over the annexed area during development of that area and during the life of the Trust, and that Barling agreed to the cessation of authority when its representative signed the Trust Indenture. In granting FCRA's motion for summary judgment, the court also enjoined Barling from exercising legislative jurisdiction over the annexed areas within the Fort Chaffee property. On direct appeal, Barling raises three arguments for reversal.

 Our standard of review is that summary judgment should only be granted when it is clear that there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *City of Lowell v. City of Rogers*, 345 Ark. 33, 43 S.W.3d 742 (2001). The purpose of summary judgment is not to try the issues, but to determine whether there are any issues to be tried. *BPS, Inc. v. Parker*, 345 Ark. 381, 47 S.W.3d 858 (2001). We have ceased referring to summary judgment as a drastic remedy. We now regard it simply as one of the tools in a trial court's efficiency arsenal; however, we only approve the granting of the motion when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admission on file is such that the nonmoving party is not entitled to a day in court, *i.e.*, when there is not any genuine remaining issue of fact and the moving party is entitled to judgment as a matter of law. *Flentje v. First National Bank of Wynne*, 340 Ark. 563, 11 S.W.3d 531 (2000). However, when there is no material dispute as to the facts, the court will determine whether "reasonable minds" could draw "reasonable" inconsistent hypotheses to render summary judgment inappropriate. In other words, when the facts are not at issue but possible inferences therefrom are, this court will consider whether those inferences can be reasonably drawn from the undisputed facts and whether reasonable minds might differ on those hypotheses. *Id.*

We now turn to Barling's numerous points and subpoints it advances for reversal.

■ For its first assignment of error, Barling argues that the trial court erred in ruling the statutory law, § 12-63-103, and the Fort Chaffee Trust Indenture signed by Barling, Fort Smith, Greenwood, and Sebastian County conveyed upon the FCRA the authority over zoning and land use issues. In response to the federal closure of Fort Chaffee, the General Assembly enacted Act 1201 of 1997, entitled an act "to provide for the management and operation of Fort Chaffee as a reserve component military training reservation . . . and for other purposes." Section 14 of Act 1201 became § 12-63-103(a) & (b), *supra*; this statute is captioned "Fort Chaffee Redevelopment Authority Public Trust," and it reads as follows:

> (a) The *State* of Arkansas *acknowledges and endorses the establishment of the Fort Chaffee Redevelopment Authority Public Trust*, created by Sebastian County, Arkansas, on February 19, 1997, as set forth in the Fort Chaffee Redevelopment Authority Indenture of Trust and pursuant to the provisions of the laws of the State of Arkansas, including specifically § 28-72-201 *et seq.*

> (b) The Fort Chaffee Redevelopment Authority Public Trust is hereby recognized by the State as the entity to: *prepare a comprehensive study of all issues related to the closure and redevelopment of Fort Chaffee Military Base surplus properties and to ensure proper planning and optimal use of the property* embodied therein; after conversion of such portions of the Base as the United States Department of Defense deems unnecessary to its overall military mission, *to manage, own and operate those portions so as to yield the maximum benefit to the residents of affected counties and communities in the State of Arkansas*; and for other purposes as enabled and set forth in the Fort Chaffee Redevelopment Authority Indenture of Trust are in the public interest and serve a public purpose and can best be accomplished by the creation of a public trust vested with the powers and duties specified in the Indenture of Trust. (Emphasis added.)

Barling contends that this statute cannot be read to afford the FCRA a kind of "super-legislative" authority over Fort Chaffee, and that while the FCRA is the entity charged with the development of Fort Chaffee, that charge does not amount to a usurpation of the control Barling exercises over the land — including the authority to impose zoning ordinances — due to its prior annexations of that land.

■ Barling argues first that the plain language of § 12-63-103(a) and (b) does not convey upon the FCRA authority to enact and enforce zoning ordinances and land use regulations. Instead, according to Barling, the FCRA is simply a local redevelopment authority, empowered only to work within already-existing local zoning structures. FCRA responds that Ark. Code Ann. § 28-72-201 (1987), cited in § 12-63-103(a), establishes the means by which governmental or municipal subdivisions may create and become parties to public trusts. Ark. Code Ann. § 28-72-202(d) (1987) specifically provides that when a municipality signs a trust indenture, that trust agreement becomes a binding contract between the state, the designated beneficiary, and the trustee of the trust, and that the trustee of the trust shall be the "regularly constituted authority of the beneficiary for the performance of the functions for which the trust shall have been created."

■ Here, the Trust Indenture, signed by Barling, Greenwood, Fort Smith, and Sebastian County as beneficiaries, provided that the closure and redevelopment of Fort Chaffee was a matter of great concern for the beneficiaries. These beneficiaries agreed that they could not meet the goals of the Trust by working alone. Accordingly, these affected communities (the beneficiaries) agreed to create a public trust that would have as its purpose the following:

> The public trust created by this Indenture shall prepare or cause to be prepared a comprehensive study of all issues related to the closure and redevelopment of the Base, shall prepare or cause to be prepared a comprehensive conversion and redevelopment plan for the Base, shall in conformity with such plan accept title from the United States of America to any and all real and personal property and improvements included in the Base, shall investigate and obtain all assistance available from the United States government and all other sources, and shall utilize such property and such assistance to replace and enhance the economic benefits generated by the Base with diversified activities, including, but not limited to, activities which will foster creation of new jobs, economic development, industry, commerce, aviation, and transportation within the affected communities.

> Such activities are in the public interest and serve a public purpose and can best be accomplished by the creation of a public trust vested with the powers and duties specified in this Indenture.

The "powers and duties specified" in the Indenture, found in Article IV, include the following:

(b) *[The power to] [a]dopt, amend, and repeal rules and regulations, restrictive covenants, land use regulations and restrictions*, development and use of signage and advertising on the Property, and development and use regulations for the Property not inconsistent with this Indenture or the Act. (Emphasis added.)

Thus, upon reading the relevant statutes — §§ 12-63-103(a) and (b) and 28-72-201 and -202 — together with the plain language of the Trust Indenture, it is clear that the Trust is the entity endowed with the authority to manage, own, and operate the land to its maximum benefit. The Trust is empowered to accomplish these objectives by adopting rules, regulations, and restrictive covenants, including land use regulations and restrictions. By signing the Indenture, Barling agreed to be contractually bound by its language, including that which gave the FCRA the authority to take title to the land and manage it to the best economic advantage and to enact land-use regulations.

■ We note Barling's argument that the trial court confused Barling's zoning authority with FCRA's planning authority, and that zoning is a separate function by virtue of the State's "police power," as delegated to cities and towns. We first point out that the General Assembly has given zoning power to an authority other than a city. *See* Ark. Code Ann. §§ 3-3-301 to -312 (Repl. 1996 and Supp. 2001) (creating the Capitol Zoning Commission). Here, the General Assembly, as already discussed above, has given the FCRA power through land-use regulations (which necessarily include zoning laws) and by approving the parties' signed Trust Indenture. The trial court correctly held the FCRA had such zoning authority, and we affirm that ruling.

Barling also challenges the trial court's holding that the FCRA's "uncontroverted affidavits" by Jimmy Hicks, the Executive Vice President of RKG Associates,[1] Randy Coleman, Vice President of Mickle, Wagner, Coleman, Inc. (which participated in the preparation of the Comprehensive Reuse Plan), and Phillip Reeves, Executive Director of FCRA, established beyond any question that serious and irreconcilable differences exist between Barling and the Trust. Each of these affiants asserted that Barling's zoning plans conflicted in numerous ways with the Trust's Reuse Plan and with

---

[1] RKG Associates is the firm that developed the Comprehensive Reuse Plan for the Fort Chaffee property.

the goals set out in the Economic Development Conveyance (EDC) application.[2] The trial court concluded that Barling's ordinances conflicted with the Trust's needs to maintain a flexible development plan in order to accomplish its goals set out in the Reuse Plan, and that if the FCRA were forced to comply with Barling's zoning ordinances, it would not be able to accomplish its goal of job creation, which was a condition of the government's conveyance of the Fort Chaffee property back to the Trust.

Barling contends that the conflicts cited by the trial court are nothing more than zoning disputes between a real property developer (FCRA) and a municipality, and should in no way equate to the type of constitutional "conflict" prohibited between the state statute and a municipal ordinance. In short, Barling submits that the fact that the FCRA's development plan is not entirely consistent with Barling's zoning regulations does not confer upon the FCRA the authority to develop its own zoning and land use regulations and ignore those imposed by Barling.

In support of its argument, Barling cites *Bolden v. Watt*, 290 Ark. 343, 719 S.W.2d 428 (1986), wherein this court held that a city ordinance will not be held to conflict with a state statute when it is possible to read them in a harmonious manner. In *Bolden*, the appellant taxicab drivers were denied permits to operate taxicabs in Little Rock under a city ordinance prohibiting permits to persons convicted of driving under the influence of intoxicating liquors. Little Rock had authority to enact such an ordinance under a 1939 state statute. The appellant drivers contended the 1939 statute conflicted with a 1973 statute, which promoted the rehabilitation of criminal offenders by providing that criminal records and misdemeanor convictions could not be used to deny a person a license or permit. The *Bolden* court upheld Little Rock's denial of the drivers' permits. The court held that the two statutes and the Little Rock ordinance could be read in harmony, because they effectuated different purposes; it reasoned that the rehabilitation statute did not attempt to give a person a right to any particular job., but still benefitted those who had DWI convictions since they could get

---

[2] The Army donated the Fort Chaffee property under the EDC, and the FCRA would not have to pay for the land so long as it utilized the property to increase employment and economic development opportunities in the region. The EDC application submitted by the FCRA stated it had identified (1) over 1,820 acres for commercial and industrial uses, (2) 30 acres for development of outreach centers intended to benefit homeless persons, (3) 66 acres for governmental purposes, (4) 460 acres for construction of roadways, (5) 1,150 acres to be preserved as wetlands, and (6) 1,604 acres as appropriate for residential land use.

other jobs. This court explained that the public safety and welfare are sound reasons for holding taxi drivers to a higher degree of accountability than the ordinary driver. *Bolden*, 290 Ark. at 346-47. Barling asserts that its zoning ordinances and the State's recognition of the FCRA are subject to the same kind of harmonization, because the FCRA is simply a real estate developer, like any other developer, that must comport with the city's zoning laws.

FCRA responds that the General Assembly, by acknowledging the Trust in § 12-63-103, also acknowledged that the Trust became the "regularly constituted authority" for accomplishing trust purposes, and that the Trust and Barling had entered into a binding contract. *See* § 28-72-202(d). FCRA thus asserts that the General Assembly "was aware, in short, that the 'binding contract' that it 'endorsed' gave FCRA land-use regulatory powers over Fort Chaffee, and stated that its provisions should be 'liberally interpreted.' " Further, because Barling — as a signatory to the Trust Indenture — acknowledged that it could not develop and manage the land to its best use by itself, FCRA contends that the General Assembly clearly intended to give the FCRA the authority for planning the appropriate use of the land, instead of simply "relying on the general zoning laws of the State." We agree with FCRA.

FCRA's authority must be considered in light of the federal government's policy behind returning closed military bases to the states in which they are located. *See* 32 C.F.R. § 175.1 (the purpose of the "Revitalizing Base Closure Communities" program is to "assist the economic recovery of communities impacted by base closures and realignments"). Further, 32 C.F.R. § 175.4 states that it is Department of Defense policy to "help communities impacted by base closures and realignments [to] achieve rapid economic recovery through effective reuse of the assets of closing and realigning bases more quickly, more efficiently, and in ways based on local market conditions and locally developed reuse plans. This will be accomplished by quickly ensuring that communities and the Military Department communicate effectively and work together to accomplish mutual goals of quick property disposal and rapid job generation."

FCRA's proposed plans for the property are designed to promote "rapid job generation," as it has designed industrial areas that take advantage of the land's rail lines, has planned a $4.2 million "nature center" in conjunction with the Arkansas Game & Fish Commission that will create numerous jobs, and has described a conference hotel to be built in a light commercial/business park

zone, adjacent to an Olympic-sized swimming pool and other attractive amenities. Barling's zoning, however, encompasses large residential areas, even though much of the land so zoned has suffered "environmental degradation" from lead-based paint, asbestos, PCBs, and other harmful agents that would require massive remediation before the land could ever be offered for residential construction and would significantly depress property values.

 Thus, FCRA has taken advantage of the authority granted to it by the Trust Indenture to swiftly move the Fort Chaffee property in the direction of job development and economic growth, in compliance with the Economic Development Conveyance it accepted from the federal government. Because the statutes at issue and the trust documents they reference recognize FCRA as "the entity" charged with managing this land, the trial court did not err in granting summary judgment to the FCRA on the question of that body's authority to control land-use issues on the property.

Barling's second point on appeal is that the trial court erred in finding that the city had ceded legislative authority over the land it annexed to the FCRA. The trial court's order found that Barling's claim to legislative authority over the Fort Chaffee property stemmed from its 1981, 1982, and 1991 annexations of tracts of land of the Fort, which are also contained in the Trust property. The court went on to note that, under § 28-72-202, "once the Trust is accepted by the beneficiaries (e.g. Barling), '[t]he trustee of the trust thereupon shall be the regularly constituted authority of the beneficiary for the performance of the functions for which the trust shall have been created.' " Thus, the court concluded that by signing the Trust Indenture, Barling ceded its legislative authority over the property encompassed within the FCRA.

Barling challenges this ruling, contending that a city's legislative power cannot be delegated to a committee or an administrative body, Czech v. Baer, 283 Ark. 457, 677 S.W.2d 833 (1984), nor can the city directors delegate or bargain away their legislative authority. Id. The trial court's finding that the City of Barling ceded all legislative authority over the land to the FCRA, the City argues, was not supported by the law or the evidence. Further, the City asserts it was not its intent to create an entity situated within its municipal boundaries yet not subject to its municipal laws. FCRA responds by noting that, because Barling's authority over zoning is entirely due to the grant of that authority by the State, the city should not be heard to complain when the State "proposes to share

power inter-locally with other cities via a binding trust, and the legislature endorses [the City's] binding contract to do so."

When Barling, the other cities, and Sebastian County signed the Trust Indenture, they agreed that they could not, by themselves, manage the conversion of the property from a former military base into an economically viable and prosperous community. Therefore, the Trust was created and given the authority to regulate the use of the land in order to achieve that goal. The Public Trust, created under the provisions of § 28-72-201 *et seq.*, was then endorsed by the Legislature in § 12-63-103, which acknowledged the authority of the FCRA to own, operate, and manage the property. Nevertheless, Barling asserts that the Trust Indenture was "nothing more than an indenture designed to permit the FCRA to go about its business of receiving the federal surplus property, and develop it according to law as with any other developer of a large parcel of property." This, however, ignores the fact already discussed above that when Barling signed the Trust Indenture, it granted the FCRA the authority to own, operate and manage the land, as well as the explicit power to "adopt, amend, and repeal . . . land use regulations." This authority to define land use regulations was specifically approved by the General Assembly in § 12-63-103, and thus we conclude that Barling unquestionably agreed to cede a portion of the authority granted to it by the State when it signed the indenture.

For its final point on appeal, Barling asserts that the trial court erred when it concluded that the affidavits of Jimmy Hicks, Randy Coleman, and Phillip Reeves, who participated in preparing the Reuse Plan, were "uncontroverted," and that these affidavits supported the conclusion that Barling's zoning ordinances irreconcilably conflicted with the Plan. Further, Barling asserts that the trial court failed to take into account the intent of the General Assembly, the FCRA, or the City of Barling as reflected in the affidavits of Richard Haberman and Jack Yates, Barling City Administrators, who both asserted that they had met with representatives of the FCRA and that those representatives offered assurances that they recognized Barling as the entity responsible for zoning.

In an order dated February 8, 2001, denying Barling's motion for reconsideration, the trial court noted that it considered the affidavits of Haberman and Yates, but it did not find them to raise a genuine issue of material fact. Further, the court noted that both

parties had declared that there were no factual issues to be considered, and that the questions presented to the court to resolve were legal in nature.

We are unable to reach the merits of Barling's argument, however, because the affidavits to which the city refers were not properly before the trial court. In this respect, the Haberman and Yates affidavits were attached as exhibits to Barling's brief in reply to FCRA's motion for summary judgment. These exhibits improperly raised new factual allegations and contentions for the first time. We do not consider such exhibits in our consideration of the propriety of summary judgment. *Eldridge v. Bd. of Corrections*, 298 Ark. 467, 768 S.W.2d 534 (1989).

We turn next to FCRA's cross-appeal, wherein the Trust argues that the trial court erred in ruling that FCRA's challenges to Barling's annexation ordinances were time-barred. As noted above, the trial court granted Barling's first motion for summary judgment, concluding FCRA's challenge to Barling's 1981, 1982, and 1991 annexation ordinances and elections were untimely filed, since § 14-40-304 requires that challenges to annexations must be filed within 30 days of the election.

FCRA asserts that it properly and timely challenged Barling's annexation elections because the ordinances calling for those elections were void *ab initio*. Particularly, FCRA argues that Barling did not have jurisdiction to acquire the federal military land, because only those laws in effect in 1941, when Arkansas ceded jurisdiction over the land to the federal government, could govern subsequent actions affecting that land. In support of its argument, FCRA cites *Arlington Hotel Co. v. Fant*, 278 U.S. 439 (1929). There, in 1904, the United States acquired exclusive jurisdiction over Hot Springs Park, and in 1913, the General Assembly enacted a law relieving innkeepers from liability to guests for loss by fire unless it was due to negligence. The plaintiffs contended the Arkansas law had no force in Hot Springs Park, which included the Arlington Hotel where the plaintiffs sustained a fire loss. The Supreme Court agreed and held that when the United States bought or condemned state land for a "national purpose," without consent of the state, then "such jurisdiction would attach as was needed to enable the United States to use it for the purpose for which it had been purchased." However, when the state formally ceded jurisdiction to the federal government, "the state and the government of the United States could frame the cession and acceptance of governmental jurisdiction, so as to divide the jurisdiction between the two as the two

parties might determine, provided only they saved enough jurisdiction for the United States to enable it to carry out the purpose of the acquisition of jurisdiction." *Fant*, 278 U.S. at 451. FCRA submits that the *Fant* holding applies to the instant case, because when Arkansas ceded jurisdiction over Fort Chaffee to the federal government in 1942, there was no authority left for the state to grant to a municipal subdivision, such as Barling, for that subdivision to exercise or assume.[3]

The trial court here rejected FCRA's argument, finding instead that the present situation was controlled by *Howard v. Commissioners of Sinking Fund of the City of Louisville*, 344 U.S. 624 (1953). We agree.[4] In that case, the City of Louisville, Kentucky, in 1947 and 1950, annexed a piece of land which the federal government had acquired in 1940, with the consent of the State of Kentucky, to construct a Naval Ordnance Plant. Louisville then began collecting a license tax on residents of that annexed area. Several employees of the ordnance plant filed suit, alleging that the plant was not within the city, since Louisville could not properly have annexed federal property, and as such, the city had no right to tax them. The Supreme Court noted as follows:

> The appellants first contend that the City could not annex this federal area because it had ceased to be a part of Kentucky when the United States assumed exclusive jurisdiction over it. With this

---

[3] We note that, here, the state law at the time of the cession permitted municipal corporations to annex contiguous property. *See* Act 14 of 1887 (subsequently codified in part at Ark. Code Ann. § 14-40-203). Further, the incorporation of municipalities has been authorized by statutory law since at least 1875 (*see* Act 1 of 1875). Thus, it is irrelevant that the municipal corporation of Barling itself was not in existence at the time of the cession in 1941, since the statutory mechanism and the authority for a municipality to annex territory was extant as of that date, and Barling's annexations were never shown to be in conflict with the federal government's jurisdiction.

[4] However, we do not conclude, as the trial court did, that *Howard* overruled the Supreme Court's holding in *Fant* (*Fant II*). We believe the cases can be read together harmoniously. In particular, FCRA cites to our decision in *Arlington Hotel Co. v. Fant*, 176 Ark. 613, 4 S.W.2d 7 (1928) (*Fant I*), which was later affirmed by the Supreme Court in *Fant II*. In *Fant I*, this court said that the cessation of jurisdiction was necessarily one of political power, and it took away the authority of the State government to legislate over the territory ceded to the General Government. However, our court in *Fant* went on to state the following:

> It therefore seems settled . . . that the laws in existence in the State of Arkansas at the time of the cession are still in effect upon the reservation, as they are not inconsistent with the laws of the United States and have not been abrogated.

*Fant*, 176 Ark. at 616. This language is consistent with that later used in *Howard*.

we do not agree. When the United States, with the consent of Kentucky, acquired the property upon which the Ordnance Plant is located, the property did not cease to be a part of Kentucky. The geographical structure of Kentucky remained the same. In rearranging the structural divisions of the Commonwealth, in accordance with state law, the area became a part of the City of Louisville, just as it remained a part of the County of Jefferson and the Commonwealth of Kentucky. A state may conform its municipal structures to its own plan, so long as the state does not interfere with the exercise of jurisdiction within the federal area by the United States. Kentucky's consent to this acquisition gave the United States power to exercise exclusive jurisdiction within the area. A change of municipal boundaries did not interfere in the least with the jurisdiction of the United States within the area or with its use or disposition of the property. *The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government.* The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed.

*Howard,* 344 U.S. at 626-27 (emphasis added).

 Thus, a municipality, such as Barling, may annex property within a federal enclave so long as it does nothing that will interfere with the jurisdiction of the federal government. Despite the FCRA's argument that Barling's intention to provide fire and police protection to the Fort Chaffee land amounted to an interference with the federal government's authority to provide such services, we agree with the trial court's conclusion that "the mere recitation in the annexation ordinances that the services will be provided, even though Barling at the time of the annexation had no authority to provide such services if the federal government objected, does not make the ordinances void."

 Because Barling had the ability to annex the federal land, we reject FCRA's argument that the annexations were void *ab initio.* We therefore conclude that FCRA's challenge to the elections, some nine, eighteen, and nineteen years after the annexations were accomplished, were time-barred under § 14-40-303. *See City of Springdale v. Incorporated Town of Bethel Heights,* 311 Ark. 497, 848 S.W.2d 1 (1993); *Duennenberg v. City of Barling,* 309 Ark. 541, 832 S.W.2d 237 (1992); *Williams v. Harmon,* 67 Ark. App. 281, 999

S.W.2d 206 (1999) (noting *Bethel Heights* and *Duennenberg* as holding that the thirty-day limitations period extends to challenges to procedures outlined in subchapter of Arkansas Code on annexations, including those procedures not enumerated in § 14-40-302). Thus, the trial court did not err in granting summary judgment on the question of FCRA's failure to bring its annexation challenge within thirty days.

■ ■ FCRA argues also that Barling's annexation ordinances, as placed before its electors, constituted a constructive fraud upon the public, thus creating an issue capable of supporting a collateral attack. However, FCRA did not obtain a ruling on this issue from the trial court. It is well settled that to preserve arguments for appeal, even constitutional ones, the appellant must obtain a ruling below. *Barclay v. First Paris Holding Co.*, 344 Ark. 711, 42 S.W.3d 496 (2001) (citing *Wilson v. Neal*, 332 Ark. 148, 964 S.W.2d 199 (1998)). The same is true of FCRA's final argument, that Barling was bound to proceed with its annexation in a general election, rather than a special election such as that used in 1981 and 1991, because the law in existence at the time of the cession of jurisdiction in 1941. The trial court did not rule on these issues, and, although we believe there is no merit to FCRA's arguments, we decline to further address them here.

For the foregoing reasons, the trial court is affirmed on direct appeal and on cross-appeal.

IMBER, J., concurs in part and dissents in part.

ANNABELLE CLINTON IMBER, Justice, concurring in part; dissenting in part. I concur with the result reached by the majority because the City of Barling's attempted annexations of property in Fort Chaffee were void *ad initio*. FCRA raised the issue of whether Barling had the power to annex a large portion of Fort Chaffee while it was still a federal enclave. If it did not, then the annexations were void *ab initio*. The majority holds, as did the trial court below, that the federal government permits a city to annex a portion of a federal enclave. However, the court asked and answered the wrong question. The issue here is whether Arkansas law empowered Barling to annex a portion of a federal enclave, not whether the federal government permitted it. The majority's decision today, which upholds Barling's annexation of almost 14,000 acres in the Fort Chaffee federal enclave, opens the door for municipal land grabs of property ceded to the federal government.

Three United States Supreme Court cases frame the issue of the type of power that a state and its political subdivisions may exercise over a federal enclave. In *Arlington Hotel Co. v. Fant*, 278 U.S. 439 (1929) (*Fant III*), the Supreme Court upheld our holding in *Arlington Hotel Co. v. Fant*, 176 Ark. 613, 4 S.W.2d 7 (1928) (*Fant II*), that when Arkansas cedes exclusive jurisdiction over to the federal government, it takes "away the authority of the State Government to legislate over the territory ceded to the General Government." *Id.* at 615 (quoting *Fant v. Arlington Hotel Co.*, 170 Ark. 440, 280 S.W.20 (1926) (*Fant I*)). This court also held that the state retained jurisdiction over transient matters (such as civil claims), but not over local matters (such as property), and that the federal enclave continued to be subject to laws in effect at the time the state ceded authority to the federal government. *Fant II, supra.* The next opinion by the Supreme Court on this issue came in 1953. In *Howard v. Commissioners of Sinking Fund of City of Louisville*, 344 U.S. 624 (1953), the Court held that a federal enclave was not a state within a state, and that the federal government was not concerned with where a city might draw its boundaries; rather the issue was whether a city's attempt to exercise authority over the property created friction between the city and the federal government. The third case on point is *Paul v. United States*, 371 U.S. 245 (1963). The *Paul* Court cites *Fant III* with favor for the proposition that "[a] State may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States. . . ." *Id.* at 268. The *Paul* Court did temper the *Fant III* view by concluding that regulatory changes that are consistent with state law, as it existed at the time of the cession, are applicable within a federal enclave. *Id.*

Reading the three cases harmoniously, it is clear that while the federal government does not object to a city annexing a portion of a federal enclave so long as it does not create friction, the power to annex the property is a question of state law, *i.e.* whether the State reserved that power to itself when it ceded jurisdiction to the federal government. The majority concludes that because the State and its municipal subdivisions had the power to annex property at the time the State ceded jurisdiction, cities continued to have that power. This court and the United States Supreme Court agree that laws in existence at the time of cession continue to be in effect on the federal enclave so long as they are not inconsistent with federal laws and purpose. *See Fant I, Fant II,* and *Fant III, supra.* This same proposition was affirmed by the Supreme Court in *Howard, supra.* Ten years later in *Paul,* the Supreme Court reaffirmed that laws in effect at the time of cession, and regulations consistent with those

laws, remain in effect over a federal enclave, but the State retains the power to legislate over the property only to the extent that the State specifically reserved that legislative power. *See Paul v. United States, supra.*

Arkansas ceded exclusive jurisdiction over the Fort Chaffee property to the federal government on December 21, 1942, and reserved to itself no legislative authority over the property. This court has previously held that when Arkansas cedes exclusive jurisdiction to the federal government, the state does not retain jurisdiction over local matters, such as property. *Fant II, supra.* The process of annexation has long been recognized as a municipal legislative function. *Gregg v. Hartwick,* 292 Ark. 528, 731 S.W.2d 766 (1987); *City of Little Rock v. Town of North Little Rock,* 79 S.W. 785 (1904). It is axiomatic that annexation asserts jurisdiction over property, a local matter. When Barling was incorporated in 1956, it had no powers beyond those granted to it by the General Assembly, the Constitution, or those incidental powers necessary to its statutory powers. *Brooks v. City of Benton,* 308 Ark. 571, 826 S.W.2d 259 (1992). Because Arkansas retained no legislative authority over the Fort Chaffee property at the time Barling was incorporated in 1956, Barling could not have been granted any power to annex that property. Therefore, Barling's attempted annexations were void *ab initio.* Where an annexation is void *ab initio,* no right can accrue under it. *Posey v. Paxton,* 201 Ark. 825, 147 S.W.2d 39 (1941).

For the above-stated reasons, I would hold that the trial court was clearly erroneous in concluding that Barling had the legislative authority to annex portions of Fort Chaffee. Thus, I would reverse the trial court on FCRA's cross-appeal.