FIRST UNITED BANK, *Trustee v.* PHASE II,
EDGEWATER ADDITION RESIDENTIAL PROPERTY
OWNERS IMPROVEMENTS DISTRICT NO. 1 of
Maumelle, Arkansas, *et al.*, *Appellees*,
and DeHaven, Todd & Co., *et al.*,
*Appellees/Cross-Appellants*

01-252                                              69 S.W.3d 33

Supreme Court of Arkansas
Opinion delivered March 7, 2002
[Petition for rehearing denied April 11, 2002.]

*Friday, Eldredge & Clark*, by: *Elizabeth R. Murray, Larry W. Burks*, and *Harry A. Light*, for appellant.

*Richard L. Lawrence*, for appellees.

*Pike & Bliss, P.A.*, by: *George Pike*, for appellees/cross appellants.

JIM HANNAH, Justice. This case involves two appeals. First, Appellant First United Bank, Trustee ("the Trustee"), appeals the chancery court's decision to award attorney's fees to Appellees Phase II Edgewater Addition Residential Property Owners Improvement District No. 1 ("Edgewater"), Maumelle Heights Planned Residential Property Owners Improvement District No. 1 ("Maumelle Heights"), Waterside Addition Municipal Property Owners Multi-Purpose Improvement District No. 6 ("Waterside"), and West Pointe Addition Municipal Property Owners Multi-Purpose Improvement District No. 7 ("West Pointe") (collectively referred to as the "Districts"). Second, Cross-appellant DeHaven, Todd & Co., DeHaven Todd Limited Partnership, John W. "Jay" DeHaven, and Michael J. Todd (collectively referred to as "DeHaven") appeals the chancellor's decision dismissing them from the case in their counterclaim against the Trustee.

This action stems from three lawsuits, two of which resulted in these appeals. First, there was the initial underlying lawsuit filed by the Trustee against the Districts, DeHaven, and other defendants, which was dismissed by the Trustee during the pendency of that action after the trial court decided a threshold issue in the Districts' favor. Second, the Districts and DeHaven each filed counterclaims in that underlying lawsuit, which are the subject of this appeal.

In June 1995 and May 1996, Citizens Bank & Trust of Carlisle, Arkansas, the original Trustee, and the four development Districts

in Maumelle, Arkansas, entered into an agreement for the reissuance and sale of bonds to the public to help finance the Districts' improvements. Each District executed a Pledge and Mortgage and pledged to the Trustee certain income from the sale and operation of the lots in order to finance the repayment of the bonds. These Pledge and Mortgage agreements, which were nearly identical for each District, pledged several sources of funding including:

> 1. The assessment of benefits on property within each District;
> 2. Special taxes levied against the property within each District;
> 3. Other revenues, including:
>> A. Revenues derived from certain escrow agreements;
>> B. Proceeds from the sale of District-owned lots;
>> C. Prepayment of all special taxes and redemption premiums (the "Lot Purchase Price") associated with each purchaser's acquisition of a lot within a District.

The revenues from certain escrow agreements stem from five separate escrow agreements, which covered several promissory notes executed by lot purchasers in favor of DeHaven, the original developer of the property. Payments made by purchasers under these escrow agreements were credited to the escrow accounts, and some of this money was used as a source of income for the bond accounts to pay the Special Taxes. Citizens Bank & Trust was succeeded by First United Bank as the indenture trustee following the creation of these agreements.

The impetus for these actions arose in late 1996 when DeHaven asked the Trustee to sign a certificate relating to the Edgewater and Maumelle Heights bond issues to facilitate financing being obtained by one of DeHaven's entities. This action apparently caused the Trustee some concern because the Trustee then consulted with its attorneys, the Friday, Eldredge & Clark Law Firm, regarding this certificate and other concerns about the financial condition of the Districts' bond obligations. The Trustee's main concerns were its belief of an apparent under-funding of the Debt Service Reserve funds, which did not total the required $250,000 for each District when the agreements were signed, the periodic use of Debt Service Reserve funds to meet debt service payments, the unpredictable inflows of money into the Districts' bond accounts, and the smaller payments received than those projected in the Official Statements of the bond issues.

Due to its concerns, the Trustee refused to sign DeHaven's certificate and informed the Districts about these possible problems.

In early 1997, the Trustee requested a "cash flow analysis" showing how the bonds would be repaid and the Debt Services Funds would be fully funded. In January 1997, David Paes, an accountant for DeHaven, acknowledged by letter that without the payments for lot releases, Edgewater, for example, would be in default, and that the lot release money from the sale of certain lots had been used to pay the debt service rather than reduce the principal on the bonds. Based on this information and its failure to receive any additional "cash flow" information of funds, the Trustee notified the Districts by letter on February 19, 1997, that it was preparing a notice to bondholders about the shortages in the Debt Service Reserve funds, foreclosure suits, and the need to increase the special taxes to cover the debt service.

On March 21, 1997, the Trustee and its counsel and the Districts' counsel, John Thurman, met and agreed to defer taking action until an independent accountant retained by the Trustee and the Districts could review the financial status of each of the four bond issues. In the meantime, Thurman wrote a letter to DeHaven requesting immediate action because DeHaven was in default under its contracts to purchase lots, and DeHaven had not paid the general taxes or special improvement assessments.

The Trustee and the Districts hired Gary Burris, a certified public accountant with Rasco, Burris & Winter (RBW), in September 1997, and Burris presented his preliminary findings and reports on October 17, 1997, to the Trustee and the Districts. According to Burris's initial findings, while Maumelle Heights's bonds were estimated to be fully paid by 2003, the three other Districts were underfunded. Burris continued to evaluate the bond funds with supplemental information, but the Trustee threatened not to call the bonds if the Districts did not indemnify the Trustee. The Districts, through counsel, responded that the Trustee was required to call bonds from excess funds. Furthermore, DeHaven indicated that it was willing to buy the District lots and pay some of the taxes, but that it wanted the Trustee's and Districts' respective counsels to resign, in part because of DeHaven's belief that the two were siding only with the Trustee's position.

During this time, lots within the districts were being sold. In order to be relieved of liability of the special taxes, property owners could prepay the Lot Release Price, as defined in paragraph 9 of the Pledge and Mortgage agreements, to the Trustee, and the Trustee would then release the lot from the obligation of the special taxation. The Trustee's release of the lot was mandatory, as indicated by

the use of the word "shall" in the Pledge and Mortgage agreements. However, in early April 1998, the Trustee received several requests to release lots that had delinquent special taxes, but the Trustee refused to release those lots even though the Lot Release Price had been paid. Many of these lots were purchased by builders or individual homeowners who wished to own the lots free of the lien imposed by the bond issues. Bond counsel, Heartsill Ragon, had earlier opined to the Trustee that delinquent special taxes need not be paid if the Lot Release Price was paid. However, the Trustee would not release the deeds despite the fact that substantial money had been paid, and the Trustee deposited the payments into the various bond funds.

On April 29, 1998, Burris presented his revised cash-flow projections based on information received as of August 31, 1997. These revised projections indicated that Edgewater, Maumelle Heights, and West Pointe would not be underfunded, but that Waterside would be. The projections indicated that Edgewater would retire its bonds in early 2009, Maumelle Heights in early 2002, and West Pointe in early 2007. Waterside, however, would be underfunded in 2017. Burris indicated that these projections were based on some unmet assumptions. Soon thereafter, DeHaven notified the Trustee on May 7, 1998, that it would sue if the Trustee did not release the deeds on the lots for which the Trustee had received the Lot Release Price. DeHaven then wrote a letter on May 29, 1998, to the Trustee enclosing Paes's cash-flow projections (which Paes later admitted were incorrect), and DeHaven followed with a letter to RBW accusing Burris of violating his fiduciary duties to the Districts and the commissioners and distributing false data. The Trustee responded that it wanted to meet with the parties to attempt to reach an agreement about resolving the situation.

In early June 1998, the Trustee directed its employee Tammy Bracewell to prepare financial schedules for each of the four districts. Bracewell prepared two schedules, "Bracewell 1" and "Bracewell 2." The Trustee directed Bracewell to include in "Bracewell 1" only the Special District Taxes and to omit all other sources of revenue that had been pledged in the Pledge and Mortgage agreements. This schedule also failed to include funds that the Trustee had actually received prior to the preparation of the report. Understandably, "Bracewell 1" concluded that all the bonds would soon default. The "Bracewell 2" schedule, however, included all sources of income, including the monies that had been received, and predicted that Edgewater and Waterside would retire their

bonds early, West Pointe would retire its bonds as scheduled, but Maumelle Heights would default in 2010.

On June 4, 1998, the Districts' counsel wrote the Trustee demanding that it immediately release the deeds on the lots for which the Lot Release Price had been paid, or the Districts would file suit against the Trustee. However, the Trustee, on its own behalf and on behalf of the bondholders without their consent and knowledge, responded by filing its initial lawsuit on June 12, 1998, against the Districts for declaratory judgment and instructions to the Trustee. Basically, the Trustee's basis in filing this suit was that it claimed that Ark. Code Ann. § 14-94-118 required more money to be paid to release a lot than was required in the Pledge and Mortgage agreements' Lot Release Price calculations contained in those documents. The Trustee asserted in its complaint that the Lot Release Price in the Pledge and Mortgage documents should be revised to comply with the statute.

On June 26, 1998, the Trustee amended its complaint and added as defendants the DeHaven group and the law firms and underwriters who were involved in the bond issue. The Trustee revised its complaint against the Districts and requested a declaratory judgment on the Lot Release Price issue, for reformation of the trust documents, for imposition of a constructive trust of all escrow agreements, for rescission of the bonds, for an affirmative injunction to require a levy of additional taxes, and included allegations of constructive fraud, negligence, malpractice, and violations of the Arkansas Securities Act against DeHaven, the law firms, and the underwriters of the bonds. As noted by the trial court in its final order, the Trustee filed this complaint and amended complaint despite the fact that it had Burris's and Bracewell's projections indicating that none of the four bond issues were in default, that some of the bonds had already been retired, that all required principal and interest payments had been made as scheduled, and that bond counsel had advised the trustee that the Lot Release Price contained in the Pledge and Mortgage agreements were correct and adequate, and that it was not necessary to collect delinquent special taxes in addition to the Lot Release Price. Despite this, the Trustee filed suit without the bondholders's consent or knowledge.

The Districts answered and counterclaimed on July 1, 1998, asking that the Trustee be enjoined from breaching its fiduciary duty to the Districts, that the Trustee be ordered to release and continue to release lots for which the Lot Release Price had been and would be paid under the formula in the Pledge and Mortgage

agreements, and that the Districts be awarded damages and attorney's fees. The Districts asserted that the Trustee had a duty and an obligation to release the lots for which the Lot Release Price had been paid under the Pledge and Mortgage agreements, and failure to do so was a breach of its fiduciary duty. DeHaven also filed a timely answer and counterclaim of similar character. On July 30, 1998, the Trustee filed its answers to the counterclaims.

The chancery court determined that the initial determination to be made in the case involved whether the Lot Release Price was adequate. Trial on this preliminary issue was held in November and December of 1998. Prior to trial, Burris indicated that his service to both the Trustee and the Districts had become adversarial and that he would have to resign due to this conflict; therefore, the trial court made Burris a court-appointed expert with a duty to neither party. At trial, the Trustee contended that the Lot Release Price in Paragraph 9 of the Pledge and Mortgage did not comply with Arkansas law and other portions of the Pledge and Mortgage agreements and asked for a revision of this price. The Trustee also contended that the "Bracewell 1" report accurately projected the payment or nonpayment of the bonds. However, on February 12, 1999, the trial court entered its final order on these issues finding, among other things, that the Lot Release Price was valid and that the delinquent Special Taxes did not have to be paid if the Lot Release Price was met, and instructed the Trustee to release the lots in accordance with the bond documents. Furthermore, the court dismissed Edgewater and Maumelle Heights from the litigation because the projections at trial indicated that they would retire their bonds. Finally, the trial court determined that although the projections at trial indicated that Waterside and West Pointe might be underfunded, default was not predicted until at least 2010, giving those Districts' commissioners time to take appropriate action. The Trustee filed its notice of appeal on March 12, 1999. The Trustee notified the bondholders regarding the litigation and filed its report of such with the trial court on April 1, 1999. Then, upon the Trustee's request, the Arkansas Supreme Court dismissed the Trustee's appeal on May 3, 1999.

After dismissing the appeal, First United Bank resigned as Trustee, and a successor Trustee was appointed. A hearing was held on this matter on June 1, 1999, and the trial court entered an order later that day approving First United Bank's withdrawal as Trustee, and ordering that no disbursement should be made from the bond funds until a successor Trustee was appointed or unless the trial court approved a disbursement. However, despite the agreement

reached on the morning of June 1, 1999, and as ordered that afternoon, the Trustee, prior to making the scheduled bond payments, paid its attorney's fees to Friday, Eldredge & Clark Law Firm from the respective bond funds: $33,946.28 from Maumelle Heights; $74,838.97 from Waterside; and $78,297.55 from Edgewater, for a total payment of $187,082.90. It also paid the Districts' attorney's fees in the amount of $5,128.51. As a result of these disbursements, the bond funds were transferred to the successor trustee with a zero balance. While funds were transferred from the Debt Service Reserve funds into the bond accounts, this left the Debt Service Reserve Funds below the required levels, which was one of the complaints and concerns First United Bank, as Trustee, had against the Districts.

Ultimately, the trial court dismissed the Trustee's and bondholders's other claims without prejudice on August 3, 1999. The litigation was not over, however, as the counterclaims were still pending. In addition, due to the Trustee's release of attorney's fees to Friday, Eldredge & Clark Law Firm despite the court's order restricting such a release, the Districts filed a motion to recover funds paid to that law firm and for sanctions on August 20, 1999.

Trial on the Districts' and DeHaven's counterclaims commenced on April 18, 2000, through April 28, 2000. After the Districts and DeHaven presented their cases, the trial court granted the Trustee's motion to dismiss DeHaven's counterclaim finding that there was no evidence of a breach of a contractual or fiduciary relationship between DeHaven and the Trustee, and that DeHaven failed to establish any damages caused by the Trustee. However, the trial court determined in its order dated July 19, 2000, that the Trustee breached a contract with the Districts by refusing to release the lots for which the Trustee had received the Lot Purchase Price detailed in the Pledge and Mortgage agreements. The trial court found that the Pledge and Mortgage agreements created a contractual duty in the Trustee where the Districts pledged the revenue as collateral for the issuance of the bonds, and the Trustee was obligated to release the lots when the Lot Release Price was paid as one form of revenue to retire the bonds. The court found that the Trustee had no discretion to release the lots, but instead was required to release the lots upon payment of the Lot Release Price, and that this agreement between the Trustee and the Districts was a contractual obligation.

While the court acknowledged that it was proper for the Trustee to ask for guidance regarding its requirements under the

trust through a declaratory-judgment action or mandamus under Paragraph 5 in the Pledge and Mortgage agreements, the court determined that the Trustee here actually asked the court to modify the agreements, including the Lot Release Price, which resulted in a breach of the agreement with the Districts. The court determined that when the Trustee pursued the litigation against the Districts and others against bond counsel's advice and without the approval of the bondholders, as required in the trust agreement, it acted on its own behalf and not for the bondholders. As such, the actions of the Trustee "were so contrary to the provisions of the Pledge and Mortgage, they constituted a breach of its contractual duty to the Districts." The court found that the Trustee only had authority to pursue litigation to require the Districts to act under the terms of the agreements, but here there was never an allegation that the Districts had not acted in compliance with those agreements. Any contention that the Districts were not meeting their obligations stemmed from the "Bracewell 1" schedules, but the court determined that reliance on that schedule was not reasonable because that schedule clearly ignored other sources of revenue in the bond documents. Therefore, the court concluded that not only was the Trustee wrong in its assertions, it proceeded without any reasonable basis for its assertions. The court also found that the breach of contract occurred when the Trustee relied only on the "Bracewell 1" projections rather than relying on Burris's projections, the "Bracewell 2" projections, advice of bond counsel, the terms of the Pledge and Mortgage agreements, and its duty to get bondholder approval before pursuing litigation.

Finally, the court determined that the Trustee's assertion that the only entity that could be harmed by its actions and that could file suit for its actions is the bondholders was contrary to the fact that reduction in the bond accounts directly harms the Districts that have to then provide additional funds to retire the bonds. Therefore, the damages to the Districts under the contractual agreement in the Pledge and Mortgage documents were the legal expenses expended from the bond funds as a result of the litigation, since the loss of those funds reduced the Districts' ability to retire the bonds. The court denied the Districts' claim for payment by the Trustee of Burris's expert fees because the Districts agreed to his appointment as the court-expert. In addition, the trial court did not award as damages any fees prior to April 1998, because the Districts failed to establish that any legal fees prior to the Trustee's refusal to release lots under the Lot Release Price were unreasonable or unnecessary. The court did note, however, that it was "very troubled" over the payments made by the Trustee to Friday, Eldredge & Clark Law

Firm from the bond funds on June 1, 1999, when the court ordered and the parties agreed that no funds would be released. However, the court determined that because it ordered the Trustee to repay the fees as damages, any violation of that order is irrelevant, but mention of it was necessary to again show that the Trustee continued to completely disregard its duties and responsibilities.

Following this decision, the Districts filed a motion on August 2, 2000, for additional attorney's fees to be paid to the Districts' attorney, Richard Lawrence, in pursuing the counterclaim against the Trustee. The court granted this motion on September 1, 2000, and awarded $128,726.25 in attorney's fees to Lawrence based on the Trustee's breach of contract with the Districts. The Trustee filed its notice of appeal on September 5, 2000, from the trial court's initial order, and an amended notice of appeal on September 11, 2000, from the trial court's subsequent fee award. The DeHaven group filed its notice of appeal on September 6, 2000, from the trial court's dismissal of its counterclaim against the Trustee.

We review chancery cases de novo on the record, but we do not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Forrest Constr., Inc. v. Milam*, 345 Ark. 1, 43 S.W.3d 140 (2001); *Harris v. City of Little Rock*, 344 Ark. 95, 40 S.W.3d 214 (2001). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

As noted, there are two appeals from the trial court's decision in this case: the Trustee's appeal from the award of damages in favor of the Districts for breach of contract, and DeHaven's appeal from the trial court's dismissal of DeHaven's claim for damages against the Trustee.

## I. The Trustee's Appeal

The Trustee raises three issues on appeal. First, the Trustee argues that the Districts lacked standing to assert a cause of action against the Trustee because the trust agreement is not a contract, and the Districts, which are not direct beneficiaries of the trust, cannot pursue a claim against the Trustee. Second, the Trustee argues that the chancery court erred in finding that there was a breach of contract because the Pledge and Mortgage agreements were not contracts but trusts, the chancery court disregarded gross

negligence as the standard of care, and the Trustee's conduct was not a breach of contract. Finally, the Trustee argues that the chancellor erred in determining the existence and amount of damages in that the Districts failed to prove any recoverable damages, the damage calculation was in error, and the trial court erred in the amount of attorney's fees awarded to the Districts.

### A. Standing of the Districts to Assert a Cause of Action

The Trustee argues that the Districts did not have standing to assert a cause of action against it in a counterclaim because the Pledge and Mortgage agreements were trust agreements between the Trustee and the bondholders, thus permitting only the bondholders to bring a cause of action against the Trustee should there be a breach of the trust. The Districts respond in three parts: first, they argue that even if the Pledge and Mortgage agreements are treated only as trusts, the Districts have standing as beneficiaries; second, they argue that Arkansas law allows a settlor to maintain an action against a Trustee; and third, they argue that the Pledge and Mortgage agreements have features of both trusts and contracts to allow claims for breaches of fiduciary and contractual duties.

■ Generally, Arkansas law on "standing" states that a person or party who has a pecuniary interest in the outcome of the action has standing to assert a claim on his or its behalf. *See, e.g., In re $3,166,199*, 337 Ark. 74, 987 S.W.2d 663 (1999); *McCoy v. Moore*, 338 Ark. 740, 1 S.W.3d 11 (1999); *Stilley v. James*, 345 Ark. 362, 48 S.W.3d 521 (2001). In these cases, this court noted that the appellants had standing to pursue an action where they would be pecuniarily affected by the outcome of the case. Under this general rule, the Districts have standing to pursue a counterclaim against the Trustee based on the fact that a decrease in the amount of funds in the bond accounts adversely and directly affects the Districts' pecuniary interests. This is even more prevalent here where the Districts' counterclaim was based on the fact that their asserted damages were due to the Trustee's pursuit of causes of action outside of the authority granted it under the trust indenture, such as revision or rescission of the trust indenture documents.

■■ The deeper issue here, however, and what the Trustee is apparently trying to argue in this point, is whether the agreement reached among the Districts, the Trustee, and the bondholders is a trust in the "donative" sense of the word or actually a contractual

trust indenture requiring performance of different duties by these parties to that agreement. The Trustee is correct in its assertion that under general trust law, a party has no standing to raise an issue regarding property in which it has no interest. *See McCollum v. McCollum*, 328 Ark. 607, 946 S.W.2d 181 (1997). Furthermore, once a settlor, the person creating the trust, releases his interest to the property to the trust, he loses any standing to challenge the administration of that property unless such power is reserved in him as a beneficiary or trustee, or unless the person has an interest in the subject matter of the trust. *Restatement (Second) of Trusts* § 200(d) (1959). In *McCollum*, this court determined that beneficiaries under a family trust had no standing to contest the sale of property by the trustee of a marital trust, where the marital trust permitted the trustee, who was also the beneficiary in that trust, to dispose of the property as she wished. The court determined that the beneficiaries in the family trust never gained an interest in the property because the family trust was a residual trust which only went into effect if the marital trust did not dispose of the property. The *Restatement (Second) of Trusts* § 200(b), however, notes that if a settlor makes a contract with the trustee, he can maintain an action against the trustee on that contract.

■ Here, however, the Pledge and Mortgage agreements, while termed by the parties as a "trust," are actually more akin to indenture agreements in the form of corporate or trust indentures, or to a deed of trust. *Black's Law Dictionary* defines an indenture as "1. A formal written instrument made by two or more parties with different interests . . .; 2. A deed or elaborate contract signed by two or more parties." *Black's Law Dictionary* 773 (7th ed. 1999). Types of indentures can include a corporate indenture, defined as "a document containing the terms and conditions governing the issuance of debt securities, such as bonds or debentures," or a trust indenture, defined as "a document containing the terms and conditions governing a trustee's conduct and the trust beneficiaries' rights." *Id.* A deed of trust is "a deed conveying title to real property to a trustee as security until the grantor repays a loan. This type of deed resembles a mortgage." *Id.* Furthermore, the statutes authorizing the creation of municipal property owners' districts indicate that such districts may issue bonds to fund improvements, and may "provide for the execution and delivery of a trust indenture or like instrument by the board securing the bonds and for the execution and delivery of other writings pertaining thereto." Ark. Code Ann. § 14-94-123(b)(2).

██ The importance in understanding the terminology here is that while the parties call this a "trust," it is not a trust in the classic "donative" sense of the word, and this court has determined on several occasions that an indenture trust is actually a contractual relationship among several parties. In *Stilley v. Makris*, 343 Ark. 673, 38 S.W.2d 889 (2001), for example, this court determined that a proposed initiative was invalid where the initiative, which proposed to require Jefferson County to sell its county hospital, impaired the contractual relations between the hospital and the county as contained in lease agreements and in a "trust indenture contract." This "trust indenture contract" involved the County's issuance of revenue bonds, secured by a mortgage lien on the hospital property and the rental payments made under a lease, and the court indicated that this was a contract between the County and the bank, which would be impaired if the proposed initiative was approved. Selling the property under the proposed initiative would make it impossible for the County, the bank, and the bondholders who relied on the lease revenues and hospital income to pay satisfy the bonds. In *City of Barling v. Fort Chaffee Redevelopment Authority*, 347 Ark. 105, 60 S.W.3d 443 (2001), this court determined that public trusts formed under Ark. Code Ann. §§ 28-72-201 to -202 (1987) involve a trust indenture, and that trust agreement becomes a binding contract between the state, the designated beneficiary, and the trustee of the trust. While that contractual right is provided by statute, the fact that the terms of the indenture trust are similar to that here is persuasive authority that such a trust indenture is, in reality, more akin to a contract.

██ Such is the case here in that obligations continue among the different parties regardless of who has the ability to control the holding and disbursement of income. Here, the Districts are under the duty to make bond payments in a timely manner, and must sell District-owned lots to help meet that requirement. The Trustee is under the duty to hold, protect, and appropriate the income, release deeds to property owners upon payment of the Lot Release Price, and retire the bonds upon payment by the Districts. The bondholders are required to finance the bonds and refund the bonds only at required times over the course of the agreement. Failure by any one of these entities to perform its duties under the trust indenture contract could result in a breach of the agreement actionable by any party harmed by that breach. Therefore, a breach of a contractual duty by the Trustee that harms the Districts is actionable in contract by the Districts as parties to the mortgage-style trust indenture.

## B. Breach of Contract

■ First, the Trustee argues that the Pledge and Mortgage agreements were not contracts that could be breached, and cites the granting clause of the Pledge and Mortgage noting that the Districts "pledge, mortgage, assign, transfer and set over" the income and rights to income to retire the bonds. The Trustee argues that this is evidence of the creation of a trust rather than a contract under the *Restatement (Second) of Trusts*. However, as discussed in the previous section, the Pledge and Mortgage agreements between the Trustee and the Districts evidence certain obligations on the part of each entity to the other in the performance of the trust indenture agreement. This agreement between the Trustee and the Districts is in the nature of a contract, and is actionable under contractual causes of action. Furthermore, the Trustee may by contract undertake other duties than those which he undertakes as trustee, and if that is done the trustee will be liable in an action at law for failure to perform such duties. *Restatement (Second) of Trusts* § 197(b). The Trustee's agreement to release the lots upon the payment of the Lot Release Price is an evident duty on the Trustee, and one which the Trustee admittedly failed to perform.

■ Second, the Trustee argues that the chancery court erroneously disregarded the "gross negligence" standard of care required under the trust indenture contract in ruling that the "gross negligence" standard did not apply to this case. Paragraph 19 of the Pledge and Mortgage agreements states in part:

> 19. *Trustee Standard of Care*: By its acceptance of the offices of Trustee and paying agent hereunder, the Trustee agrees to discharge its duties as a reasonably prudent Trustee. The Trustee shall be responsible only for gross negligence in the execution of its trust. . . .

The trial court found that the gross–negligence standard of care only applies in tort cases, and because this is not a tort claim by the beneficiary bondholders, but rather a breach–of–contract claim by the Districts, the gross–negligence standard of care does not apply. The trial court was correct. Clearly, by the terms of the trust indenture agreement, the Trustee agreed to be bound to a "gross negligence" standard of care in its execution of the "trust" and in its duties as a trustee. The Trustee's actions in refusing to release the lots, however, was an action taken in violation of its contractual duties to the Districts and not within the confines of the trust

agreement with the bondholders. Therefore, the Trustee was liable for a contractual breach, which carries no consideration of a duty of care.

As its third point here, the Trustee argues that its conduct was not a breach of contract because the Trustee was duty bound to solve the problems of the trust to protect the bondholders. The Trustee argues that it was fully empowered to ask for guidance from the trial court regarding the declaration of rights under the documents, and that payment of its attorney's fees for this action cannot in hindsight justify an award of damages after an unsuccessful litigation on the Trustee's part.

As the chancery court noted below, and as is apparent on appeal, the Trustee continues to miss the point that the breach of contract did not occur when it filed suit or pursued a declaratory judgment action, but rather the breach occurred when the Trustee refused to release the lots to purchasers who had paid the Lot Release Price under the guise that the Pledge and Mortgage documents had to be revised or rescinded. It was this refusal to release these lots that spurred the litigation in this action.

Under a contractual theory, the Trustee's actions were unwarranted. Contractually, the Trustee entered into an agreement with the Districts under Paragraph 9 of the Pledge and Mortgage agreement that once the Lot Release Price has been paid, the Trustee would release the deed to the lot owner, who would then be excused from paying any additional Special Taxes or Assessment of Benefits. Here, however, the Trustee does not deny that it did not release the lot pursuant to the provisions in Paragraph 9 — rather, it argues that it had the right to do this. However, the contractual language of the Pledge and Mortgage agreement provides the Trustee no discretion in the release of these lots. Instead, Paragraph 9 indicates that the Trustee "shall" release the lots upon payment of the Lot Release Price. As noted above, breach of the Pledge and Mortgage agreements, as mortgage-type contracts, becomes actionable. Therefore, failure to release the lots pursuant to Paragraph 9 resulted in a breach of contract.

Under the terms of the Pledge and Mortgage agreements, the Trustee was empowered under Paragraph 5 to proceed by mandamus or other proper remedy, in the name of the bondholders, to compel the Districts' performance of the terms of the agreement. Furthermore, Paragraph 16 lays out the Trustee's obligations if the Districts default. Under Paragraph 16, the Trustee and its

counsel may be paid a reasonable amount to litigate and solve a default situation. However, both Paragraph 5 and Paragraph 16 anticipate that action by the Trustee will only be taken if the Districts fail to meet their obligations or if they default. In this case, however, the Districts did not fail to meet their obligations, nor did they default in their payments of the bonds. While the Trustee certainly retained the power to ask the chancery court for a declaratory judgment regarding its obligations under the Pledge and Mortgage agreements, it did not have authority to ask for reformation or rescission of the agreements. Because the Trustee stepped outside its permitted boundaries under the terms of the trust, the Districts, as parties to a contract, were compelled to bring this counterclaim against the Trustee to recover the funds expended for fees which were improperly paid from the bond funds to pursue litigation that was largely unwarranted.

## C. Damages

In its third point on appeal, the Trustee argues that the trial court erred in determining the existence and amount of damages, and in awarding attorney's fees to the Districts.

### 1. Existence of Damages

First, the Trustee argues that the Districts failed to prove any recoverable damages. The Trustee argues that "if the prosecution of the litigation was considered a breach, the districts certainly suffered no out-of-pocket loss. The districts did not pay the attorney's fees. The fees were paid out of the respective bond funds." The Trustee further asserts that the trial court indicated that the breach occurred when the Trustee refused to release the lots and based the fee award from that date forward, but then also concluded that no damages resulted from that breach. As such, the damages awarded do not bear any relationship to any damages proved.

Damages recoverable from breach of contract are those damages that would place the injured party in the same position as if the contract had not been breached. *Dawson v. Temps Plus Inc.*, 337 Ark. 247, 987 S.W.2d 723 (1999); *Carroll v. Jones*, 237 Ark. 361, 373 S.W.2d 132 (1963). Here, the question is whether the Trustee's breach of contract in its failure to release lots upon payment of the Lot Release Price resulted in any damages. Certainly, this failure at that time did not, in and of itself, cause

"damage" to the amount of money in the bond funds. However, the trial court found that it was this act that triggered the resulting litigation that drained the bond funds the Trustee claimed to be protecting. The Trustee attempts to argue that the court's finding that this alone was the "breach" on which damages were based; however, in reading the court's order, it is apparent that the court found that upon that initial breach, all actions by the Trustee thereafter seemed to be one continuing breach for the reason that the entire litigation was not warranted. For example, the court also found that the Trustee breached the contract when it requested a reformation of the Lot Release Price through litigation rather than following the requirements in the Pledge and Mortgage agreements requiring approval by two-thirds of the bondholders. The Trustee, in fact, did not even attempt to get that approval. The court also found that the breach related to the Trustee's reliance on the "Bracewell 1" schedule indicating that default was imminent, rather than on the other information, including the "Bracewell 2" schedule, indicating that at least three of the four Districts would retire the bonds. Therefore, while the initial breach of contract related to the Trustee's failure to release the lots, the trial court also indicated that the Trustee continued breaching the contract with the Districts by pursuing actions that, under the trust indenture contract, it did not have authority to pursue. Certainly, while the Trustee retains authority to ask for guidance under or a declaratory judgment about the terms of the agreements, the Trustee's actions in this case extended beyond those powers, resulting in unnecessary litigation that drained the bond funds, resulting in damage to the Districts.

Ultimately, the trial court found that the only damages proved by the Districts were those relating to the payment of litigation expenses, namely attorney's fees, for pursuing an action contrary to the contract and trust language. In other words, to place the Districts in the same position as before the initial breach, payment of all litigation expenses after April 1, 1998, when the Trustee refused to release the lots, constituted the required damages. The trial court did not err in this decision.

### 2. Calculation of Damages

Second, the Trustee argues that if the trial court is affirmed on the award of damages, the court wrongly calculated the damages because it relied on a law firm exhibit showing when invoices were paid to Friday, Eldredge & Clark Law Firm rather than when the work was done. As such, the award of fees after April 1, 1998, could

take into account fees paid for work done before April 1, 1998. The Districts respond that the trial court based its decision, in part, on the Trustee's own exhibit, and that the Trustee's own witness testified to the accuracy of those charges, but that the final order offers no specific document on which the trial court relied.

Notably, the Districts are correct that the trial court did not base its conclusion on any particular document as no such document is indicated in the final order. Two documents, DX 49, a report completed by Paes detailing the payout of attorney's fees during this case, and PX 305, a summary detailing the amount of $315,528.97 for fees paid to Friday, Eldredge & Clark Law Firm for activities from April 1, 1998, to February 25, 1999, offer evidence on which the trial court apparently relied. It appears that the trial court took these and other documents into account when it reached its final award total of $381,436.96 for the amount paid to the Trustee's attorneys in the litigation. In order to return the Districts to the position in which they would have been had the contract not been breached, the trial court was correct in assessing damages for the attorney's fees paid from the bond funds during the pendency of the litigation by the Trustee and the time during which the Districts pursued the Trustee for repayment of those funds into the bond accounts. These fees were based in large part on the Trustee's own records and exhibits. As such, we can not find that the trial court erred in assessing these damages.

### 3. Attorney's Fees Awarded to the Districts

Finally, the Trustee argues that the trial court erred in awarding fees to the Districts. The Trustee argues that the fee reports submitted by the Districts included unrelated expenses, and, therefore, those fees should have been reduced by approximately $35,000. The Districts respond that the trial court made an initial adjustment downward of attorney's fees authorized by statute, but thereafter the Trustee failed to show that the award of fees was an abuse of discretion. Therefore, the fees should stand.

A trial court is not required to award attorney's fees and, because of the trial judge's intimate acquaintance with the trial proceedings and the quality of service rendered by the prevailing party's counsel, we usually recognize the superior perspective of the trial judge in determining whether to award attorney's fees. *Marcum v. Wengert*, 344 Ark. 153, 40 S.W.3d 230 (2001); *Jones v. Abraham*, 341 Ark. 66, 15 S.W.3d 310 (2000); *Chrisco v. Sun Industries Inc.*,

304 Ark. 227, 800 S.W.2d 717 (1990). The decision to award attorney's fees and the amount to award are discretionary determinations that will be reversed only if the appellant can demonstrate that the trial court abused its discretion. *Nelson v. River Valley Bank & Trust*, 334 Ark. 172, 971 S.W.2d 777 (1998); *Burns v. Burns*, 312 Ark. 61, 847 S.W.2d 23 (1993). A grant of attorney's fees is an issue within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Id.* The decision of whether to award attorneys' fees in a contract case is governed by Ark. Code Ann. § 16-22-308, which provides in pertinent part:

> In any civil action to recover on . . . breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney fee to be assessed by the court and collected as costs.

In awarding fees under Ark. Code Ann. § 16-22-308, the trial court has broad discretion on whether to award fees, and his decision will not be reversed absent an abuse of discretion. The operative word in this statute is "may." The word "may" is usually employed as implying permissive or discretional, rather than mandatory, action or conduct and is construed in a permissive sense unless necessary to give effect to an intent to which it is used. *Jones, supra; Chrisco, supra.*

Here, the trial court entered a subsequent order on September 1, 2000, granting fees to the four Districts in the amount of $128,726.25 to be divided out among the Districts according to the attorney's allocation of percentages of contribution to the lawsuit. According to the order, the trial court reviewed the submission of fees by Attorney Lawrence with some care, adjusting the fees downward and correcting a typographical error in order to reach the correct amount of fees. The Districts were clearly the prevailing parties as they succeeded in proving a breach-of-contract claim resulting in reimbursement to the bond funds of the damages from the breach, *i.e.*, the attorney's fees expended in unwarranted litigation. While the Trustee argues that the fee schedules submitted by the Districts' attorneys listed unnecessary expenses, the Trustee fails to specifically state why certain expenses are not warranted, other than to indicate that these expenses are "Non-litigation" expenses. However, a review of the listed expenses indicates that these expenses are for the time period included within the award of damages and involve various matters involved in this litigation. As such, we cannot say that the trial court abused its discretion in awarding these fees.

## II. DeHaven's Appeal

As the second appeal involved in this case, DeHaven filed an appeal from the trial court's dismissal of it from the litigation at the close of the Trustee's case upon a directed-verdict motion. On appeal, DeHaven argues that it only appeals from the portion of the chancellor's order denying its request for attorney's fees, and asserts three points in support of this argument. First, DeHaven argues that the trial court was correct in requiring the Trustee to reimburse the bond accounts. Second, DeHaven argues that the trial court erred in failing to recognize that its escrow agreements were incorporated into the Districts' Pledges and Mortgages signed by the Bank that same day. Finally, DeHaven argues that the trial court erred in failing to realize that DeHaven suffered the same damages as the Districts, and that DeHaven's help in recovering those damages also entitles it to attorney's fees.

First, the trial court dismissed DeHaven from the litigation upon a motion by the Trustee to dismiss both DeHaven's and the Districts' claims. At trial, the court indicated that the dismissal was due to "lack of proof," and in its final order the court indicated that DeHaven was dismissed "for failure to prove any breach of a duty, either fiduciary or contractual . . . and for failure to establish any damages sustained by the DeHaven Group. . . ." A chancery court is to evaluate the motion for directed verdict by deciding whether, if the proceeding were a jury trial, the evidence would be sufficient for the case to go to the jury. *See Swink v. Giffin*, 333 Ark. 400, 970 S.W.2d 207 (1998). In its evaluation of the plaintiff's case, the chancery court is not to assess the credibility of the testimony presented by the plaintiff's witnesses. *Id.* To determine whether the plaintiff has presented a *prima facie* case, the trial court must view the evidence in the light most favorable to the nonmoving party, and give the evidence its highest probative value, taking into account all reasonable inferences deducible from the evidence. *Bradford v. Verkler*, 273 Ark. 317, 619 S.W.2d 636 (1981); *Suzuki of Russellville, Inc. v. Mid-Century Ins. Co.*, 14 Ark. App. 304, 688 S.W.2d 305 (1985). If the evidence, viewed in the light most favorable to the nonmoving party is insubstantial, the trial court should grant the defendant's motion for directed verdict. *City of Little Rock v. Cameron*, 320 Ark. 444, 897 S.W.2d 562 (1995). Evidence is insubstantial when it is not of sufficient force or character to compel a conclusion one way or the other or if it does not force a conclusion to pass beyond suspicion or conjecture. *Id.*; *Burns v. Boot Scooters, Inc.*, 61 Ark. App. 124, 965 S.W.2d 798 (1998).

### A. Lack of Proof of a Breach of Duty

DeHaven first argues that the trial court erred in finding lack of proof of a breach of duty due to the fact that DeHaven did not sign the Pledge and Mortgage Agreements upon which the court relied to find a breach of contract. DeHaven argues that the escrow agreements it signed with the Trustee were incorporated into the Pledge and Mortgage agreements, thus making it a party to those documents through incorporation by reference.

As the Trustee suggests, we cannot find where DeHaven argued during the discussion on the directed-verdict motion that these contracts were incorporated by reference so that it was included in the Pledge and Mortgage agreements as a party to those agreements. During the discussion regarding the motion for directed verdict the court discussed DeHaven's lack of proof as to damages sustained, but did not discuss how DeHaven planned to dovetail its participation into the Pledge and Mortgage agreements. As such, this argument is raised for the first time on appeal, and we, therefore, will not consider it. *Hurst v. Holland*, 347 Ark. 235, 61 S.W.3d 180 (2001); *Ghegan & Ghegan, Inc. v. Barclay*, 345 Ark. 514, 49 S.W.3d 652 (2001).

### 2. Lack of Proof of Damages

DeHaven next argues that the trial court erred in finding that DeHaven did not prove that it was damaged by the money paid for attorney's fees to the Trustee's attorneys. DeHaven argued below that because the money was taken out of the bond accounts to pay for fees, this delayed the retirement of the bonds, which delayed the release of the escrow agreements as security for the bonds. DeHaven notes that its "Collateral Assignment and Security Agreement" lays out the procedure for the Trustee's ability to collect DeHaven's proceeds from the escrow accounts to pay a portion of the bond amounts. As part of that procedure, as soon as the bonds are retired and nothing is left owing under the Pledge and Mortgage agreements, DeHaven's and the Trustee's agreement becomes void, and DeHaven then resumes the right to collect all income due under the escrow accounts. Therefore, the sooner the bonds are paid, the sooner DeHaven begins to receive money from the escrow accounts. However, as noted above, the Trustee did not breach an agreement with DeHaven and, therefore, DeHaven has no cause of action on which it was the prevailing party to recover

fees under Ark. Code Ann. § 16-22-308. Therefore, fees are not warranted.

Affirmed.