Cite as 2020 Ark. App. 365

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-19-508

| | |
|---|---|
| LINDY "BUD" BOSTIC<br><br>APPELLANT<br><br>V.<br><br>RICHARD STANLEY<br><br>APPELLEE | Opinion Delivered September 2, 2020<br><br>APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CV-13-842]<br><br>HONORABLE CHRIS CARNAHAN, JUDGE<br><br>AFFIRMED IN PART; REMANDED FOR CLARIFICATION IN PART |

**BRANDON J. HARRISON, Judge**

Lindy "Bud" Bostic appeals a $211,000 judgment that was entered against him by the Faulkner County Circuit Court in favor of Richard Stanley after a bench trial. Among other things, Bostic claims that the court erred in its award of damages in this breach-of-contract case. We affirm the court's finding that a breach of contract occurred but remand the case and direct the court to clarify its damages award.

I. *Summary of the Case*

We start by summarizing the testimony that the parties provided to the circuit court during the bench trial. Landowner Richard Stanley holds a parcel of real property totaling about 1038 acres in Faulkner County, Arkansas. In 2005, Stanley signed a three-year land lease with Bud Bostic. As a tenant under the lease, Bostic had the right to grow crops or run cattle on the property, but he had an obligation to pay Stanley $8,000 annually in rent.

Under the lease, Bostic promised to cultivate and maintain the property in accordance with good husbandry practices and farming operations. Bostic also agreed not to commit or permit waste on the property. The lease further obligated Bostic to "perform improvements, land clearing, and other needed repairs and improvements as determined and directed by [Stanley]." Bostic also agreed to peaceably deliver possession of the leased premises to Stanley upon termination of the lease "for any reason whatsoever." And should Stanley ever permit Bostic to holdover after the lease's expiration or termination, then the lease was to "be construed as a tenancy from calendar month to calendar month at a monthly rental equal to a proportional amount of the rent under this lease."

The contractual relationship flexed quickly. Bostic paid $8,000 to Stanley the first year. During the second year, however, Bostic and Stanley orally modified the lease as it related to cash rent. Specifically, in exchange for Bostic's clearing some bottomland in the northeast corner of the property, Stanley agreed to forgo the $8,000 annual rent that was due in May 2006. Consequently, Bostic did not pay the second year's rent that was due in May 2006. In October 2006, Stanley sent Bostic a letter stating that the lease had been terminated; Stanley also demanded that Bostic vacate the property. The termination letter stated that Bostic had not completed work on the property, had not complied with the land clearing and other improvements as directed by Stanley, and that there was a "continual problem" with Bostic's interfering with some other property rights that Stanley had leased to a hunting club. A February 2007 letter from Stanley to Bostic stated that Stanley would "reconsider our contract" depending on the outcome of a meeting related to the hunting club.

The parties dispute what happened from October 2006 (when the termination letter was sent) until September 2007 (when Stanley filed a complaint for unlawful detainer against Bostic, which was dismissed). It is undisputed, however, that Bostic cleared trees and brush on Stanley's property during the three-year lease period (May 2005 until May 2008). The core of the parties' dispute is whether Bostic breached the lease agreement and whether Stanley suffered damages.

According to Stanley, Bostic failed to leave the land until the lease expired in May 2008, which Stanley views as a wrongful act. He said that Bostic did not do the work that he had agreed to do in lieu of the rent. Stanley also argued to the court that Bostic had committed widespread destruction of the property; threats by Bostic to Stanley that "he better not catch me [Stanley] on the property" allegedly followed. In addition to the allegation that Bostic failed to clear the bottomlands properly, Stanley said that Bostic wrongly destroyed red oak and white oak trees in a mixed area on the property called Cascade Hill. Stanley said that he valued the old oak trees for their aesthetic appeal, as shade for cattle, and for producing acorns attracting deer and other wildlife. There was testimony that it would take hundreds of thousands of dollars to replace the grand old trees.

Bostic claimed that during the second and third year of the lease, he believed the problems had been worked out with Stanley. Bostic also produced a record of specific hours that he used heavy equipment to clear the land in lieu of the annual lease payments. In hindsight, Bostic said that he had "wish[ed] [he] had paid the rent instead of doing the work." Bostic did not dispute that he had cleared and cut down the "valuable" oak trees on Cascade Hill. But according to Bostic, Stanley never gave specific instructions and

3

provided no oversight on which trees were or were not on the chopping block. Bostic said that when he leased the property, it had not been bush hogged in two or three years and was "grown up pretty bad." One of the first places Bostic started clearing was Cascade Hill. According to Bostic, "the whole hill had been cleared, 100 percent"; but the previous workers had "left these windrows back when they cleared it several years before." Tree saplings and "little ole sprouts" were growing in the abandoned brush piles "with thorn trees and bushes." Bostic said that Stanley had told him, "I don't care if all the trees are pushed down, I want this to be a cattle farm, I don't like trees, and the best way to trim a tree is one time at the ground." (In total contradiction to Bostic's testimony, Stanley said, "I never ever in any possible way insinuated that I wanted those trees [on the hill] removed.") Bostic said the big trees were cleared, some were used for firewood, and most of them were "pushed up in brush piles and windrows." The brush and thickets were cleared, and a half-mile field was opened for Stanley's benefit, according to Bostic.

In 2013, Stanley sued Bostic alleging that he had breached the written lease and asked for a judgment in excess of $400,000. Bostic answered the complaint, denied that he had breached the contract, and asserted that he had discharged his obligation by performance. Bostic filed a counterclaim against Stanley alleging that Stanley was unjustly enriched by his labors on the property and that he was entitled to $100,000 as restitution. The circuit court found in favor of Stanley on his breach-of-contract claim; the court denied Bostic's counterclaim for restitution; and it entered a $211,000 judgment against Bostic. The court wrote that Stanley's land "was maliciously damaged and that the measure of the before and after value of the land due to Mr. Bostic's unnecessary and retaliatory destruction of the tree

4

stands to be valued at $195,000." In its final order, the circuit court made specific credibility findings and essentially believed Stanley and his witnesses and discredited Bostic and his witnesses. The court also ordered Bostic to pay Stanley's attorney's fees.[1]

II. *The Circuit Court's Finding that Bostic Breached the Agreement is Not Clearly Erroneous or Clearly Against the Preponderance of the Evidence*

The standard of review for fact-finding during bench trials is in Rule 52(a) of the Arkansas Rules of Civil Procedure. It states: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous (clearly against the preponderance of the evidence), and due regard shall be given to the opportunity of the circuit court to judge the credibility of the witnesses." Ark. R. Civ. P. 52(a)(1) (2019). Bostic contends that there was no breach because he fully performed under the contract. Alternatively, he contends that the terms of the lease are too unclear to be enforceable. We cannot say that the circuit court clearly erred on this point given our review of the evidentiary record that was made to the circuit court. We therefore affirm the court's finding that Bostic breached the lease agreement (a contract) and explain the reasons for this conclusion below.

Stanley had the burden of proving the existence of an agreement, a breach of the agreement, and resulting damages. *Sexton Law Firm, P.A. v. Milligan*, 329 Ark. 285, 298, 948 S.W.2d 388, 395 (1997). To be enforceable, a contract's terms must be reasonably definite and certain. *Superior Fed. Bank v. Mackey*, 84 Ark. App. 1, 129 S.W.3d 324 (2003). The terms are reasonably certain if they provide a basis for determining the existence of a

---

[1]Bostic's notice of appeal designates only the judgment, not the posttrial order awarding attorney's fees as the order or judgment on appeal.

5

breach and for awarding an appropriate remedy. *City of Dardanelle v. City of Russellville*, 372 Ark. 486, 277 S.W.3d 562 (2008). A valid contract does not, however, require that the parties share "identical, subjective opinions" as to the meaning or interpretation of the contractual terms. *Dziga v. Muradian Bus. Brokers, Inc.*, 28 Ark. App. 241, 244, 773 S.W.2d 106, 107 (1989).

Approximately fifteen witnesses testified during the bench trial. After making its credibility determinations, the circuit court concluded that "[e]ach of the alleged breached contract items were individually and cumulatively material such that Mr. Bostic violated his obligations under the lease." The court awarded Stanley $8,000 a year in unpaid cash rent for the "last two years of the lease" ($16,000) and $195,000 for the destruction of trees.

First, we hold that it was not clearly against the preponderance of the evidence for the circuit court to find that Bostic had breached the lease by not paying $8,000 in annual rent for the second and third years of the lease. While Bostic is correct that Stanley had agreed to forfeit rent in exchange for clearing the bottomland, the court was still tasked to decide whether Bostic had made good on his end of that modification. And on that point, the parties' testimony was diametrically opposed. Stanley—whose testimony the court specifically credited—said that he required Bostic to clear this area when the weather was hot and dry in June, July, or August. And according to Stanley, in October 2006, Bostic had not cleared the area, and the wet weather made the land unfit to be worked. Bostic instead had caused severe damage by working land when it was too wet. For his part, Bostic said that "[w]e never cleared all of that land down there [the bottomland]." So the court had to determine whether Bostic had gone "above and beyond" the lease by performing

6

the hours of heavy-equipment use or whether he had failed to complete the specific task he had agreed to do in lieu of paying the $8,000 in annual rent due under the lease for the second or third year. Although we have recited just a bit of the voluminous testimony, the court's finding on this record is not clearly erroneous (or against a preponderance of the evidence) given the disputed testimony the witnesses provided.

Second, it seems the court found that Bostic breached the lease by damaging certain trees on Stanley's property because the court awarded $195,000 for destruction of trees. On this point of breach, we hold that the court's finding was not clearly erroneous (or against the preponderance of the evidence). No one disputed that Bostic pushed down the old oak trees in the Cascade Hill area. The question was whether Bostic's actions improved the property or wasted it. The court's decision required a credibility determination. There was testimony that Bostic's clearing the land made it much more useable for pasturing, which increased the land's value. And there was testimony that Bostic had decreased the value of Stanley's land by tearing down the old white oak and red oak trees because they are helpful to the wildlife hunted on the property. Stanley also said that he personally valued them. Moreover, by clearing the property during a wet season, Bostic negated his responsibilities to practice good husbandry and be a good steward of the land, leaving the land too rough to be bush hogged with large holes and ruts, and allowing excessive erosion to occur.

The bottom line here is that the court heard from two contracting parties who could not have had more opposing views on what transpired and why. Given the evidence as a whole, it was neither clearly erroneous nor clearly against the preponderance of the evidence for the court to conclude that Bostic failed to uphold his end of the bargain by not doing

the "improvements, land clearing, and other needed repairs and improvements as determined and directed by [Stanley]."

We therefore affirm the circuit court's finding that Bostic breached the lease. That takes us to the damages amount.

III. *The $195,000 Damages-Award Calculation, However, is Unclear and Requires a Remand*

Bostic further contends that the circuit court's damages award is not supported by the law or the facts and is therefore clearly erroneous. Because it is unclear why the court awarded $195,000 for damages to Stanley's trees, we remand this issue to the court to clarify its damages calculation.

In its final order, the court adopted and incorporated Stanley's posttrial brief, which focused primarily on damages. After the trial, Stanley urged the court to adopt two measures of damages, which were a "replacement value" or a "diminution in market value." The final order awarding $195,000 for the trees does not expressly identify whether the court used a "replacement value" or a "diminution in market value" measurement. The difference can be a meaningful one.

On appeal, Stanley contends that "without saying so explicitly, the trial court awarded [him] permanent damages" based on the "before and after value of the land." Bostic disagrees with Stanley's characterization of the court's damages award. Bostic's specific point is that the court erred essentially as a matter of law by its reliance on Stanley's experts: (1) John Gore—a landscape architect—who calculated damages using the value of replacing the trees removed from the Cascade Hill area; and (2) Scott Adams, who was not a licensed real estate appraiser. Bostic argues that none of Stanley's experts "gave an appraisal

8

of the property showing the value of the land before the trees were cut and the value after the trees were cut." In contrast, Bostic's expert David Reinold, a certified real estate appraiser and forester, testified that his method used "what a typical buyer and a typical seller would typically come together and sell in an arm's length transaction," and he concluded that Stanley's property lost no value from the destruction of the trees. The circuit court, however, discredited Bostic's expert, concluding that "Mr. David Reinold's testimony was not rooted in fact and his analysis of the valuation of the land and damage was fantastical."

What is the correct measure of damages for destruction of trees on a leasehold property like this? The general rule is that the purpose and use of trees—as well as the purpose of the legal cause of action—matters when a court determines what remedy is available for damage to trees. *E.g.*, Ark. Code Ann. § 15-32-301 (Repl. 2016); Ark. Code Ann. § 18-60-102 (Repl. 2015); *see also* Howard W. Brill, 1 *Arkansas Law of Damages* § 30:3 (Nov. 2019 update) (collecting tree cases).

The evidence in each case will determine the proper measure of damages. *Linebarger v. Owenby*, 79 Ark. App. 61, 67, 83 S.W.3d 435, 439 (2002). For example, if the purpose of the action is only to recover the value of the trees as chattel after they are removed from the soil, then the recovery is the *market value* of the trees for timber or fuel. *E.g.*, *Burbridge v. Bradley Lumber Co.*, 218 Ark. 897, 239 S.W.2d 285 (1951). But here, Stanley was not interested in recovering the market value of the timber, which the testimony placed at $2– $3 a ton for hardwood pulp.

The other two remedies potentially available under Arkansas law are the ones identified in the posttrial brief that the circuit court adopted: diminution in value and

9

replacement cost. The first (and older) measure of damages available at common law involves the reduction in the money value of the land caused by the defendant's act of tree destruction. *Floyd v. Richmond*, 211 Ark. 177, 183, 199 S.W.2d 754, 758 (1947). This facet of damages asks whether the trees that were cut added value to the land and whether the market value of the real property was decreased by the cutting. *Id.* The second (and newer) measure of damages available at common law involves the cost of restoring or replacing the cut trees. *Worthington v. Roberts*, 304 Ark. 551, 803 S.W.2d 906 (1991) (adopting the replacement-cost rule for the first time in Arkansas). This facet probes the aesthetic value of the trees, their role in establishing privacy or energy savings, and whether the trees furthered the owner's plans for the property. *Revels v. Knighton*, 305 Ark. 109, 110, 805 S.W.2d 649, 650 (1991). Most, if not all, of the replacement-cost cases involve trees located in residential areas. *E.g.*, *First Elec. Co-op. Corp. v. Charette*, 306 Ark. 105, 810 S.W.2d 500 (1991) (three-acre residential lot).

Bostic argues that, over his objection, the court allowed Stanley to introduce evidence of replacement cost as a measure of damages and that such evidence cannot support the six-figure damages award. We agree with Bostic that replacement cost is not one of the possible measures of damages in this situation given the caselaw. Over Bostic's (many) and (timely) objections, Stanley submitted the testimony of John Gore, who testified that the cost of replacing the trees that Bostic removed was $366,840 to $1,031,820. But under Arkansas law, replacement costs are not available as a measure of damages when they are grossly disproportionate to the value of the land. *Linebarger v. Owenby*, 79 Ark. App. 61, 83

10

S.W.3d 435 (2002) (replacement cost inappropriate when trees were cut from a ten-acre tract).

This is not a residential-lot case, so the court erred when it applied a measure of damages that is more closely tied to residential-lot cases than a husbandry lease that concerns 1,000 acres of undeveloped land. *Id.* In our view, this dispute is more like the case when a utility company cut down forty-five trees, in which case the replacement value of trees was not a proper element of damages. *See DeBoer v. Entergy Ark., Inc.*, 82 Ark. App. 400, 109 S.W.3d 142 (2003). Consequently, the court's reception of expert testimony about replacement cost was inappropriate because replacement cost was not available to Stanley as a measure of damages, not even for the grand old oak trees that once thrived on Stanley's land.

This means that the court should have used the diminution-of-market-value approach. And Bostic is correct that none of Stanley's experts testified as to the diminution in market value of Stanley's property. Scott Adams, a realtor, did not identify "the market value of the property itself nor does his report so state" according to Stanley's own posttrial argument to the circuit court. Gore, a landscape architect, did not testify about any diminution in market value. Landowner Stanley did state at trial that the damage Bostic wrought devalued his land by $450 an acre ($450,000 in damages).[2] But Stanley provided no method by which to calculate such a number. Furthermore, it was undisputed that Stanley leased the property *for more money* in annual rent after the three-year lease period with Bostic had ended.

---

[2]Stanley testified that he believed his property was worth $4,500 an acre ($4,671,000).

This is where it is important to keep in mind the purpose of the legal cause of action. The basic purpose of a remedy to a breach of a contract is to place the injured party in the same, or as good a, position as it would have been if the contract had not been breached but had been performed. *First United Bank v. Phase II, Edgewater Addition Residential Prop. Owners Improvement Dist. No. 1*, 347 Ark. 879, 69 S.W.3d 33 (2002); *see* AMI Civ. 712 (2014) (damages should put the plaintiff in no better a position than he would have been in if both parties had performed all their promises under the contract). Arkansas law permits some uncertainty in calculating damages. *Bank of Am., N.A. v. C.D. Smith Motor Co.*, 353 Ark. 228, 245, 106 S.W.3d 425, 434 (2003) ("Our cases give the factfinder, jury, or trial court some latitude in its decision in awarding damages when arriving at a figure and have not required exactness on the proof of damages. If it is reasonably certain that some loss has occurred, it is enough that they can be stated only proximately.") (internal citations omitted). But the judgment must have some relationship to the damages; and the damages must be sufficiently established to withstand an appeal. *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 259, 987 S.W.2d 722, 729 (1999) (reversing when damages were too speculative and not proved to be a consequence of the breach of the contract).

In this case, Stanley had the burden to prove the value of the benefit that Bostic was supposed to confer on him according to the terms of the contract. Stanley's remedy is limited to what he would have received or gained if the other party (Bostic) had not breached. Given this standard, we cannot tell why the court awarded Stanley $195,000 for "maliciously damaged" trees in this breach–of–contract case. Put differently, we agree with

Bostic that there is no indication from the record, or the judgment itself, as to how the damages were computed so as to get the figure of $195,000.

When this court cannot determine the basis for the circuit court's award of damages in a bench trial, we may remand for the limited purpose of directing the court to clarify the method used to determine damages and to correct any potentially erroneous calculations as a result. *See Glover v. Woodhaven Homes, Inc.*, 346 Ark. 397, 57 S.W.3d 211 (2001). We choose that course here.

The case is remanded to the circuit court. On remand, we direct the circuit court to explain how it decided to award $195,000 to Stanley on the breach-of-contract claim. *Pruitt v. Dickerson Excavation, Inc.*, 2010 Ark. App. 849, 379 S.W.3d 766.

Affirmed in part; remanded for clarification in part.

GLADWIN and HIXSON, JJ., agree.

*Gordon & Caruth, PLC*, by: *Jeannie L. Denniston*, for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Matthew L. Brunson*, for appellee.